Michael A. Isaacs, State Bar No. 99782
Jennifer C. Hayes, State Bar No. 197252
McKENNA LONG & ALDRIDGE LLP
One Market Plaza, Spear Tower, 24th Floor
San Francisco, California 94105
Telephone:     415.267.4000
Facsimile:     415.267.4198
misaacs@mckennalong.com
jhayes@mckennalong.com

Attorneys for Janina M. Hoskins,
Chapter 11 Trustee

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re<br><br>SILICON VALLEY<br>TELECOM EXCHANGE, LLC,<br>250 Stockton Ave.<br>San Jose, CA 95126<br>SANTA CLARA-CA<br>Tax ID / EIN: 77-0510895,<br><br>Debtor. | Case No:  14-52449 MEH<br>Chapter 11<br>M. Elaine Hammond<br><br>**DECLARATION OF JANINA M. HOSKINS IN SUPPORT OF MOTION: (1) TO ASSUME AND ASSIGN NONRESIDENTIAL REAL PROPERTY LEASE; AND (2) TO SELL ESTATE'S RIGHT, TITLE, AND INTEREST IN PROPERTY, FREE AND CLEAR OF INTERESTS**<br><br>**REQUEST FOR FINDINGS UNDER 11 U.S.C. § 363(m)**<br><br>Date:  January 29, 2015<br>Time: 10:30 a.m.<br>Ctrm: United States Courthouse<br>     280 South First Street, Room 3070<br>     San Jose, California 95113 |

1.     I am Janina M. Hoskins, the Chapter 11 Trustee in Bankruptcy of the estate of the above Debtor.  This declaration is in support of my Motion: (1) to Assume and Assign Nonresidential Real Property Lease; and (2) to Sell Estate's Right, Title, and Interest in Property Free and Clear of Interests.

2.     I was appointed as Trustee of the Debtor's bankruptcy estate for cause, following a motion filed by creditor Campeau Goodsell Smith ("CGS").  I am informed and believe that CGS

was general bankruptcy counsel for the Debtor in its previous chapter 11 bankruptcy case, filed in 2001 (the "First Bankruptcy Case"). The motion to appoint trustee, filed in the present case as Docket No. 18, alleged that the Debtor's principals, Fred and Karen Rubio (together, the "Rubios"), failed to pay funds to creditors as required by the Debtor's plan of reorganization confirmed in the First Bankruptcy Case.

3. The primary asset of the Debtor's bankruptcy estate is a lease by and between the Debtor and the San Jose Unified School District (the "Landlord") dated February 18, 1999 (the "Lease") of nonresidential real property and buildings located at 250 Stockton Avenue, San Jose, California (the "Premises"). The Lease was originally signed by Rubio & Associates, Inc. and was assigned to the Debtor on or about July 14, 1999. I have reviewed the Lease and the amendments to the Lease. I am informed and believe that the Lease attached as **Exhibit A** is an authentic copy. I am informed and believe that the First Amendment to Lease Agreement between the Landlord and Rubio & Associates, Inc., dated June 18, 1999 and attached as **Exhibit B,** is an authentic copy. I am informed and believe that the Assignment, dated July 14, 1999 by and between Rubio & Associates, Inc. and the Debtor and attached as **Exhibit C**, is an authentic copy .

4. RAIX, LLC ("RAIX") and Silicon Valley Telecom & Internet Exchange, LLC ("SVTIX") are insiders of the Debtor. I am informed and believe that Karen Rubio and Fred Rubio (together, the "Rubios") manage RAIX and SVTIX and are the principal members of RAIX and SVTIX.

5. The Rubios provided me with documents for RAIX and SVTIX, including copies of subleases between the Debtor and RAIX, and between the Debtor and SVTIX. An authentic copy of the unsigned sublease between Debtor and RAIX that I received from the Rubios is attached as **Exhibit D**. An authentic copy of the unsigned sublease between Debtor and SVTIX that I received from the Rubios is attached as **Exhibit E**. The Rubios have provided me with a First Amendment to each of the RAIX and SVTIX subleases; however, these First Amendments are stamped "confidential". Accordingly, absent a court order or written permission of the Rubios, I do not plan to file copies of the First Amendments.

6. I am informed and believe that the subleases between the Debtor and RAIX and the

Debtor and SVTIX have never been approved by the Landlord and that approval by the Landlord of any sublease of the Premises is required.

7. I am informed and believe that the Rubios, via RAIX and SVTIX, generate income from the Premises by providing colocation and related services.

8. I am informed and believe that, prepetition and postpetition, the Rubios have rented out parking spaces at the Premises, including venue parking for evening concerts and events at the San Jose Convention Center; however, the income from this "side business" has not been turned over to the Debtor or to me, and does not appear to have been turned over to RAIX or SVTIX, based on my review of the financial records of the Debtor, RAIX, and SVTIX.

9. Since my appointment as Chapter 11 Trustee of the Debtor's estate, I have worked diligently trying to gather money that could be used to pay ongoing expenses of administration, including rent and utilities. However, the biggest problem in this case has been cash issues. Despite substantial sums being collected by SVTIX and RAIX from their customers, SVTIX and RAIX have not been paying the Debtor sufficient sums for the Debtor to meet its monthly, postpetition operating expenses. SVTX receives its income from payments by RAIX and SVTIX from monies RAIX and SVTIX receive from persons with whom SVTIX and RAIX have sub-sub leases or contracts (the "Sub-Sub Lessees"). RAIX and SVTIX then turn certain monies over to me, and I pay the Debtor's operating expenses, including rent and utilities. I have paid rent and utilities late or in partial payments, depending on when I receive monies from SVTIX and RAIX, and depending on the amount I receive. I have had difficulty making payments to Pacific Gas & Electric ("PG&E") in a timely and complete manner, and PG&E has served several disconnection notices regarding the Premises. If the power is disconnected, then service could be interrupted at the Premises to RAIX and SVTIX customers, including to the Sub-Sub Lessees. Unpaid postpetition operating expenses include stub rent for June 2014 totaling $43,277 for June 6, 2014 to June 30, 2014 and substantial sums owing to PG&E. Pursuant to the subleases between the Debtor and SVTIX, and the Debtor and RAIX, SVTIX and RAIX owe Debtor a fixed monthly rent payment. However, even that payment has been reduced, based upon what the Rubios call "Fair Market Value."

10.     I am informed and believe that, notwithstanding the precarious financial condition of the Debtor, the Rubios disbursed $94,000 to themselves in 2014 as follows: (a) on October 20, 2014, at a time when PG&E was threatening to disconnect power to the Premises, Fred Rubio took a draw from RAIX in the sum of $22,000; (b) from March 31, 2014 to October 27 2014, the Rubios took partner draws from RAIX totaling $35,000 (not including the $22,000 partner draw Fred Rubio took on October 20th); and (c) from May 8, 2014 to October 20, 2014, SVTIX paid fees to the Rubios totaling $37,000.

11.     I am informed and believe that the Lease is substantially more valuable if the Debtor is operating and the power is on. Due to the lack of income turned over by RAIX and SVTIX to pay standard operating expenses, time is of the essence in obtaining approval of a sale, assumption, and assignment.

12.     Since my appointment as Chapter 11 Trustee, I have tried to maximize the value of the estate's property, including the Lease. I have had multiple communications with various interested assignees/buyers of the Lease, including Cerulean Global Services, LLC ("Cerulean"), Chaego, John Simkiss, the Rubios, and several commercial property brokers. Cerulean and John Simkiss expressed interest in an assumption and assignment of the entire Lease; however, Mr. Simkiss later decided not to pursue any interest in the Lease. The Rubios expressed interest in taking over the Lease, and made a formal offer; however, their offer was for several hundred thousand less than the Cerulean offer. One of the brokers with whom I spoke made a verbal offer to purchase the estate's interest in the Lease; however, the offer was conditioned upon purchase of the Premises, and the District did not agree to sell the Premises. Based on my conversations with the District, I am informed and believe that, even if the District wanted to sell the Premises, the process to obtain required approvals would take 4-6 months. Given the monthly operating losses, and the importance of keeping the business running to maximize the value of the Lease, attempting to obtain approval of a possible sale of the Premises does not appear feasible.

13.     I received an offer from Chaego, which proposed to occupy 12,000 square feet it is currently occupying, upstairs, for a combination office and data center, a 3,000 square foot power room in the basement, and a 1,000 square foot common area for $16,000 per month. Chaego

proposed to lease additional space in 12,000 square foot increments within six to nine months, depending on how quickly Chaego could upgrade the current space. Chaego proposed tenant improvements, including some that Chaego believed required permits and some that Chaego believed did not require permits. Chaego offered to post a bond for certain of the proposed tenant improvements and to put up "its share" of replenishable PG&E deposit appropriate for the space.

14. I also received an offer from Cerulean, and am in the process of finalizing and executing an asset purchase agreement with Cerulean (the "Asset Purchase Agreement" or the "APA") that provides, in summary, as follows, subject to Bankruptcy Court approval. The APA provides that, in exchange for the assumption, assignment, and sale of the Lease and other assets identified later in this Declaration, Cerulean will pay $620,000 (the "Purchase Price") at closing. In addition, the APA provides that Cerulean will pay $7,500 (the "Additional Buyer Payment Amount") in six months after closing upon satisfaction of several conditions identified in the Asset Purchase Agreement. Specifically, the APA provides as follows: (a) First, Cerulean shall make a wire payment to me for the cure amount owing to the Landlord and I will pay the cure amount to the Landlord on the later of (i) the Closing Date of the Asset Purchase Agreement; or (ii) three business days after the execution of the Assumption, Assignment, and Amendment of Lease; and (b) Second, Cerulean shall make a wire payment to me in an amount that is equal to the Purchase Price of $620,000 less the cure amount for the Lease, and less any prorations as set forth under section 10.1 of the APA.

15. Conditions precedent to the assumption, assignment, and sale are identified in Article VIII of the Asset Purchase Agreement, and include that the Bankruptcy Court enters an order approving the sale by January 29, 2015 and that such order is not stayed. Another condition precedent is that the sale order be acceptable to Cerulean in its absolute and sole discretion. Through my counsel, I directed Cerulean to review the Northern District of California guidelines regarding sale orders. The current version of the APA, which I am still finalizing with Cerulean, provides for the following additional conditions precedent: that the sale is free and clear of the interests of RAIX, SVTIX, the sub-sub lessees/contracting parties, the taxing authorities, and PG&E.

16. In exchange for $620,000 at closing and $7,500 on 180 days after closing (subject to conditions set forth in the Asset Purchase Agreement), and subject to Bankruptcy Court approval, the estate will assume, assign, and sell the Lease to Cerulean, and the estate will sell to Cerulean the following additional property (the "Additional Property"): (a) the estate's $100,000 deposit with the Landlord; (b) the accounts receivable owed to the estate by RAIX, SVTIX, Fred Rubio, Karen Rubio, Rubio Associates, Inc. or any Rubio Affiliate; (c) the estate's right, title, and interest in the tangible personal property as necessary for Cerulean's operations at the Premises; (d) the estate's documents; (e) the estate's permits, if any, to the extent transferable; (f) the estate's intellectual property, if any; (g) to the extent transferable, the estate's rights, if any, under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of Debtor or with third parties; (h) the estate's rights, if any, under or pursuant to all warranties, representations, indemnification agreements, and guarantees made by suppliers, manufacturers and contractors, (i) the estate's goodwill and other intangible assets, if any, associated with the business and/or the purchased assets; (j) the estate's rights, claims, or causes of action relating to assets, properties, business, or operations of the estate or the purchased assets; provided, however, that such claims do not include any claims of the estate against RAIX, SVTIX, Fred Rubio, Karen Rubio, Rubio & Associates, Inc., and/or any other Rubio affiliate (other than the accounts receivable owed by those persons to the Debtor); (k) the estate's rights, if any, to the telephone and facsimile numbers and e-mail addresses used by the estate, as well as rights to receive mail and other communications addressed to the estate; (l) the estate's other property pertaining to or used or useful in the conduct of the business or the ownership of the purchased assets, (m) any rebates received at any time from PG&E in connection with or related to (i) services provided to the Premises or Cerulean by PG&E following the Closing Date; (ii) any alteration or improvement of the energy efficiency of the Premises by Cerulean; or (iii) any other action taken by Cerulean, or any funds expended by Cerulean, that qualify for a rebated from PGE; and (n) the estate's other assets otherwise described above but that are not expressly designated in the Asset Purchase Agreement as "Excluded Assets."

17. The Asset Purchase Agreement provides for a break-up fee to Cerulean if an

overbidder succeeds in becoming the assignee under the Lease. The agreed-upon break-up fee (subject to Court approval) is the lesser of 4% of the purchase price or the reasonable fees and expenses incurred by Cerulean in connection with the transaction.

18. I am informed and believe that the Landlord and Cerulean have agreed upon a modification to the Lease (the "Lease Modification"), which provides, *inter alia*, for Cerulean to lease the Premises for ten years, with an option for Cerulean to request an additional five-year extension, provided that Cerulean is not in default under the Lease. I am further informed and believe that the Lease Modification: (a) fixes rent at $51,932.25 per month during the first year of the term, with monthly base rent to increase three percent per year; (b) requires Cerulean to increase the deposit by $55,796.75 (*i.e.* from $100,000 to $155,796.75), to be increased during the fifth year of the term so that the security deposit is equal to three months' based rent at the then-current base rent; and (c) permits the Landlord at its discretion to use up to ten parking spaces as reserved parking spaces at the Premise, and to request to use a portion of the Premises at a fair market rental value rate for co-locating purposes during the lease term and any option term. I am informed and believe that the Lease Modification provides for a cure amount of $281,877.91.

19. I am informed and believe that the Lease Modification is conditioned upon execution of a guaranty by Cerulean's parent company, pursuant to which the parent company absolutely and unconditionally guarantees timely payments to the District under the Lease up to a maximum amount of $200,000.

20. In my business judgment, based on my extensive efforts to market the Lease, and in comparing the offers I have received, I have concluded that the consideration being offered by Cerulean to the estate for the assumption, assignment, and sale of the estate's right, title, and interest in the Lease and the Additional Property is the best offer the estate has received.

21. In my opinion, the following interests in the Lease are in *bona fide* dispute: (a) the interests of RAIX and SVTIX, including the subleases between the Debtor and RAIX and between the Debtor and SVTIX, because: (i) I am informed and believe that the RAIX and SVTIX subleases were never approved by the District, and that the District has not otherwise consented to RAIX or SVTIX having any other possessory interest in the Premises; and (ii) even if such

7

subleases were valid, RAIX and SVTIX are in payment default to the Debtor under the terms of the subleases; and (b) the interests of Fred Rubio, Karen Rubio, Rubio & Associates, Inc., any entity controlled by the Rubios, and the interests of the Sub-Sub Lessees (as defined in the APA), because I am informed and believe that (i) the District has not consented to these persons having any possessory interest in the Premises; and (ii) any rights of the Sub-Sub Lessess in the Premises are dependent upon the rights of RAIX and SVTIX in the Premises; however, RAIX and SVTIX have no valid possessory interest in the Premises.

22. I am informed and believe that the following interests in the Additional Property are in *bona fide* dispute: the interests of RAIX, SVTIX, Fred Rubio, Karen Rubio, Rubio & Associates, Inc., and any entity controlled by the Rubios (collectively, the "Insiders"), because I am informed and believe that the Insiders have breached their fiduciary duties to the Debtor and have misappropriated the Debtor's corporate opportunities and revenues, diverting them to create value for the Insiders at the expense of the Debtor. For example, Judge Weissbrodt determined that, when Fred and Karen Rubio were managing the Debtor, after the Debtor confirmed its plan of reorganization, Debtor flagrantly violated its plan and failed to make required distributions under the plan. Attached as **Exhibit F** is the Memorandum Decision Following Evidentiary Hearing entered on March 4, 2013 in the Debtor's prior Chapter 11 bankruptcy case, Case No. 01-55137-ASW, Docket No. 1159.

23. I do not anticipate that any of the taxing authorities will object to the relief sought in the Motion, specifically: the Internal Revenue Service, the County of Santa Clara Office of the Tax Collector, the Franchise Tax Board, the Employment Development Department, and PG&E, because I am unaware of any lien or other interest the taxing authorities or PG&E may have in the Lease or the Additional Property and, if there is an interest in the Lease or Additional Property, it will attach to the proceeds of sale to the same extent, validity, and priority that it attaches to the Lease and the Property.

1 I declare under penalty of perjury that the above statements are true and that if called as a
2 witness I could and would testify to their truthfulness. This declaration is executed on the 9th day
3 of January 2015 in Middletown, CA.

4

5 /s/Janina M. Hoskins
Janina M. Hoskins

USW 804831496.3