# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

In re

SILICON VALLEY
TELECOM EXCHANGE, LLC,
250 Stockton Ave.
San Jose, CA 95126
SANTA CLARA-CA
Tax ID / EIN: 77-0510895,

  Debtor.

Case No: 14-52449 MEH
Chapter 11
M. Elaine Hammond

**DECLARATION OF ROBERT TAYLOR IN SUPPORT OF MOTION: (1) TO ASSUME AND ASSIGN NONRESIDENTIAL REAL PROPERTY LEASE; (2) TO SELL ESTATE'S RIGHT, TITLE, AND INTEREST IN PROPERTY, FREE AND CLEAR OF INTERESTS; AND (3) FOR MODIFICATION OF ORDER (DKT. #68)**

**REQUEST FOR FINDINGS UNDER 11 U.S.C. §§ 363(m)**

Date:  January 29, 2015
Time:  10:30 a.m.
Ctrm:  United States Courthouse
       280 South First Street, Room 3070
       San Jose, California 95113

I, Robert Taylor, hereby declare:

1. I am over the age of eighteen (18), and base this declaration upon my personal knowledge, except where stated on information and belief, and if called as a witness would competently testify as follows:

2. I am an officer of Cerulean Global Services, LLC ("Cerulean") This declaration is in support of the motion of Janina Hoskins, chapter 11 trustee (the "Trustee"): (1) to Assume and Assign Nonresidential Real Property Lease; (2) to Sell Estate's Right, Title, and Interest in Property Free and Clear of Interests; and (3) for Modification of Order (Dkt. # 86) (the "Sale Motion").

3. I hold a Bachelor of Science degree from CSU, Northridge. I also hold a Doctor of Law (JD) degree from Stanford Law School, and a Master of Business Administration (MBA) from Stanford Graduate School of Business.

4. I have extensive experience in managing, operating, consulting, and investing in a variety of businesses. I was a partner at the global consulting firm McKinsey & Company, and I have over twenty-five years of consulting experience. I have advised dozens of chief executive officers involved in companies ranging from start-ups to Fortune 500 companies, both in the capacity as a consultant and as a private equity professional. I have served as the chief executive officer of Decorative Concepts; Aldik Artificial Flowers; and Quivox Systems. Among my private investment activities, I co-founded and led two private equity firms and have overseen in excess of $1 billion in private investment.

5. On or about January 16, 2015, the Trustee and Cerulean finalized an asset purchase agreement with the Trustee (the "Asset Purchase Agreement"). I was the principal person overseeing the negotiation of the Asset Purchase Agreement with the Trustee on behalf of Cerulean. I will refer to certain terms of the Asset Purchase Agreement in this Declaration. However, by making statements about the Asset Purchase Agreement, I do not intend to alter any terms of the Asset Purchase Agreement, and the Asset Purchase Agreement and related documents will govern the terms of the transaction between the Debtor's estate and Cerulean.

6. Cerulean (through its counsel, Wick Phillips Gould & Martin, LLP ("Wick Phillips")) began discussions with the Trustee regarding the assets of the Debtor's estate, and the terms on which it would purchase certain assets of the Debtor's estate, in October 2014. During November and December 2014, Cerulean continued these discussions, and began negotiations over the terms of the Asset Purchase Agreement. The Trustee and Cerulean exchanged multiple drafts of the Asset Purchase Agreement, and the terms of the Asset Purchase Agreement were heavily negotiated. The negotiations were arms-length. At all times during the negotiations, Cerulean has acted in good faith. Moreover, at all times during the negotiation of the Asset Purchase Agreement, the Trustee and her representatives were free to discuss a potential transaction with parties other than Cerulean.

7. All payments to be made by Cerulean to the Debtor's estate are set forth in the Asset Purchase Agreement.

8. Cerulean has not entered into any agreement to control the consideration offered to the Trustee in the Asset Purchase Agreement, and is not aware of any such agreement between third parties. There has been no fraud or collusion between Cerulean and any other potential bidder for the estate's assets, or between Cerulean and the Trustee.

9. There is no common identity of principals between Cerulean on the one hand, and the Debtor on the other.

10. To the best of my knowledge, information, and belief, neither I nor anyone else associated with Cerulean is an "insider" of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.

11. Neither I nor anyone else at Cerulean knew or had any connection with the Trustee or her counsel before commencing discussions regarding a potential transaction in October 2014.

12. Among other things, the Asset Purchase Agreement provides that, in exchange for the assumption, assignment, and sale of other assets identified in the Asset Purchase Agreement, Cerulean will pay $620,000 at closing and an additional $7,500 in six months after closing upon satisfaction of several conditions identified in the Asset Purchase Agreement.

13. A principal asset of the Debtor's bankruptcy estate which Cerulean is purchasing under the Asset Purchase Agreement is a 25-year lease by and between the Debtor and the San Jose Unified School District (the "Landlord") dated February 18, 1999 (the "Lease") of nonresidential real property and buildings located at 250 Stockton Avenue, San Jose, California (the "Premises"). Cerulean and the Landlord have agreed to a modification of the Lease upon the closing of the Asset Purchase Agreement (the "Lease Modification"). Among other things, the Lease Modification provides for Cerulean to lease the Premises for ten years, with an option for Cerulean to request an additional five-year extension, provided that Cerulean is not in default under the Lease.

In addition, the Lease Modification: (a) fixes rent at $51,932.25 per month during the first year of the term, with monthly base rent to increase three percent per year; (b) requires Cerulean to increase the deposit by $55,796.75 (*i.e.* from $100,000 to $155,796.75), to be increased during the fifth year of the term so that the security deposit is equal to three months' rent at the then-current base rent; and (c) permits the Landlord at its discretion to use up to ten parking spaces as reserved parking spaces at the Premises, and to request to use a portion of the Premises at a fair market rental value rate for co-locating purposes during the lease term and any option term. The Lease Modification provides for a cure amount of $281,877.91.

14. In addition, under the Asset Purchase Agreement, the estate will sell to Cerulean certain additional property, which (together with the Lease) constitute "Purchased Assets" under the Asset Purchase Agreement. Purchased Assets include the following property: (a) the estate's $100,000 deposit with the Landlord; (b) the accounts receivable owed to the estate by RAIX, SVTIX, Fred Rubio, Karen Rubio, Rubio Associates, Inc. or any Rubio Affiliate; (c) the estate's right, title, and interest in the tangible personal property as necessary for Cerulean's operations at the Premises; (d) the estate's documents; (e) the estate's permits, if any, to the extent transferable; (f) the estate's intellectual property, if any; (g) to the extent transferable, the estate's rights, if any, under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of Debtor or with third parties; (h) the estate's rights, if any, under or pursuant to all warranties, representations, indemnification agreements, and guarantees made by suppliers, manufacturers and contractors, (i) the estate's goodwill and other intangible assets, if any, associated with the business and/or the purchased assets; (j) the estate's rights, claims, or causes of action relating to assets, properties, business, or operations of the estate or the purchased assets; provided, however, that such claims do not include any claims of the estate against RAIX, SVTIX, Fred Rubio, Karen Rubio, Rubio & Associates, Inc., and/or any other Rubio affiliate; (k) the estate's rights, if any, to the telephone and facsimile numbers and e-

mail addresses used by the estate, as well as rights to receive mail and other communications addressed to the estate; (l) the estate's other property pertaining to or used or useful in the conduct of the business or the ownership of the purchased assets, and (m) the estate's other assets otherwise described above but that are not expressly designated in the Asset Purchase Agreement as "Excluded Assets."

15. Among the Purchased Assets are the fixtures and equipment listed on item 29 of Schedule B of the Debtor's bankruptcy schedules, which include the following: three generators, the UPS (uninterruptible power supply) equipment, air conditioning equipment, load banks, and switch gear. I have attached the Debtor's bankruptcy schedules to this Declaration as Exhibit A. The bankruptcy schedules were signed under penalty of perjury by Fred Rubio.

16. The Purchased Assets include the following (the "Fixtures")

- 4 - Diesel generators (the "Generators"):
    - o 3 generators in parallel, which, on information and belief, are 1.25 megawatt (MW).
    - o 1 stand-alone generator, which, on information and belief, is 1.5 megawatt (MW)
- Two load banks (the "Load Banks")
    - o 1 - load bank for 3 generators
    - o 1 - load bank for the stand-alone generator
- All computer room conditioner units (the "CRACS")
- All uninterruptible power supply equipment (the "UPS's")
- All transformers
- All automatic transfer switches ("ATS's")
- All power distribution units ("PDUs")
- Parallel gear
- 42 evaporative cooling units on top of the roof units (the "Cooling Units")
- All computer racks (the "Racks").

17. I have personally inspected the Premises, and I am familiar with the Fixtures.

18. The Generators are located in the parking lot. There are three Generators that are

paralleled, and one "standalone" Generator. The Generators are affixed to the concrete by bolts, and would be very difficult to remove from the Premises. Each Generator likely weighs thousands of pounds. Heavy equipment would be needed to remove them from the Premises. Attached as Exhibit B is an aerial view of the Premises as shown and retrieved from the Google Earth website. I annotated Exhibit B to show the location of the Generators and certain other fixtures discussed in this Declaration. On information and belief, the Generators were installed by someone other than Mr. Rubio, and were abandoned as fixtures.

19. There is a load bank for the three paralleled Generators, along with a fuel tank. There is also a load bank for the one "standalone" generator, and this load bank likewise has a fuel tank. The load banks are affixed by bolts to the ground would be difficult to remove from the Premises, and would likely require heavy equipment to remove them because of their significant weight. I have shown on Exhibit B the location of the Generators. On information and belief, the load banks were installed by someone other than Mr. Rubio, and were abandoned as fixtures.

20. The CRACS are located inside the building. Each CRAC is approximately six to seven feet high, two feet wide, and several feet long; and likely weighs several hundred pounds. The CRACS are affixed to the floor and ceiling, would be difficult to remove from the Premises, and removal would likely cause damage.

21. There are at least 3 UPS's located in the building. The UPS's are affixed to the floor, weigh several hundred pounds, would be difficult to remove from the Premises, and removal would likely cause damage. On information and belief, many of the UPS's were installed by someone other than Mr. Rubio, and were abandoned as fixtures.

22. There are several transformers located in the building. The transformers are bolted to the floor, would be difficult to remove from the Premises, and removal would likely cause damage. On information and belief, many of the transformers were installed by someone other than Mr. Rubio, and were abandoned as fixtures.

23. There are ATS's located in the building. The ATS's are bolted to the floor, would be

difficult to remove from the Premises, and removal would likely cause damage. On information and belief, the ATS's were installed by someone other than Mr. Rubio, and were abandoned.

24. There are PDUs located in the building. The PDUs are bolted to the floor. On information and belief, the PDUs were installed by someone other than Mr. Rubio, and were abandoned.

25. There is parallel gear located in the building. The parallel gear is bolted to the floor, would be difficult to remove from the Premises, and removal would likely cause damage. On information and belief, the parallel gear was installed by someone other than Mr. Rubio, and was abandoned.

26. There are approximately 42 Cooling Units bolted to the roof of the building. The Cooling Units would be difficult to remove from the roof of the Premises and removal would likely cause damage. I have shown on Exhibit B the location of the Cooling Units.

27. There are over 300 Racks bolted to the floor in the Building. The Racks are metal frames that hold the computer servers. The Racks are bolted to the ground, would be difficult to remove from the building. On information and belief, many of the Racks were installed in the building by someone other than Mr. Rubio.

28. All of the Fixtures are important for the purpose and use of the Premises as a data center.

29. I have attached as Exhibit C a true and correct copy of the Declaration of Scott L. Goodsell in Support of CGS Motion to Appoint Chapter 11 Trustee (the "Goodsell Declaration"). The Goodsell Declaration appears as Docket Entry # 18 (attachment # 1) on the Court's docket in this case. Attached to the Goodsell Declaration is a Memorandum Decision Following Evidentiary Hearing (the "Memorandum Decision") issued by the United States Bankruptcy Court for the Northern District of California (the "Bankruptcy Court").

30. Among the findings in the Memorandum Decision are the following:[1]

- In 2001, one of the tenants at the Property—Enron—filed for Chapter 11 bankruptcy and rejected Enron's lease with Debtor. Enron vacated the Premises and abandoned approximately $20 million in equipment, all of which was built into the Premises. Mr. Rubio testified that Debtor made leasehold improvements on the property in 2007. The improvements included building out the cabinets and racks, adding electrical infrastructure to some of the Enron rooms, bolting down the cabinets and ladder racking, and building up the data centers.

- According to Mr. Rubio, Debtor spent $41,822.95 on contractors in 2007, $230,572.69 on contractors in 2008, $201,836.08 on contractors in 2009, and $76,059.46 on contractors in the first half of 2010. They type of work performed by the contractors could be repairs, maintenance, or "new installs."

- Of the $41,822.95 spent on contractors in 2007, Mr. Rubio testified that none was spent on new infrastructure, but instead was used to expand the existing infrastructure in the Enron Data Center.

- In 2008, the Debtor spent $230,572.69 on infrastructure improvements; Debtor bought a new UPS system and installed rows of cabinets, cages, and ladder racking. The UPS System purchased in 2008—which Debtor referred to as "UPS Charlie"—was installed in the summer of 2008 at a cost of $115,000.00. According to Mr. Rubio, once UPS Charlie was installed, there were customers who needed to use it, and UPS Charlie began to generate $33,000.00 per month.

- Between the time of confirmation of the Plan and the end of 2008, Mr. Rubio agreed that Debtor performed speculative improvements to the building in the hope of attracting new tenants, which included a new transformer at a cost of $38,000.00, with a $26,000.00 installation cost. Mr. Rubio also agreed that

---

[1] *See* Memorandum Decision at pp. 11 – 14.

Debtor replaced at least one UPS system at a cost of $28,000.00, plus $15,000.00 in installation costs. Debtor also installed lighting ballasts outside because NTTA complained that women were being accosted in the parking lot.

- In 2009, Debtor spent $201,836.08 on infrastructure improvements on the air conditioning system, as well as on "walls in the power room in the basement." In the first half of 2010, Debtor spent $76,059.46 on infrastructure improvements. Mr. Rubio also testified that Debtor purchased another UPS system—"UPS David"—in 2010 for approximately $115,000 to $120,000.

- Debtor purchased $22,000.00 in cabinets in April 2010, which allowed for a portion of UPS David to be leased.

I declare under penalty of perjury that the above statements are true and that if called as a witness I could and would testify to their truthfulness. This declaration is executed on the 16th day of January 2015 in Los Angeles, California.

Robert Taylor

# United States Bankruptcy Court
## Central District of California

In re    **Silicon Valley Telecom Exchange, LLC**            ,     Case No.    **14-52449**

                                            Debtor              Chapter             **11**

## SUMMARY OF SCHEDULES

Indicate as to each schedule whether that schedule is attached and state the number of pages in each. Report the totals from Schedules A, B, D, E, F, I, and J in the boxes provided. Add the amounts from Schedules A and B to determine the total amount of the debtor's assets. Add the amounts of all claims from Schedules D, E, and F to determine the total amount of the debtor's liabilities. Individual debtors must also complete the "Statistical Summary of Certain Liabilities and Related Data" if they file a case under chapter 7, 11, or 13.

| NAME OF SCHEDULE | ATTACHED (YES/NO) | NO. OF SHEETS | ASSETS | LIABILITIES | OTHER |
|---|---|---|---|---|---|
| A - Real Property | Yes | 1 | 0.00 | | |
| B - Personal Property | Yes | 3 | 501,134.79 | | |
| C - Property Claimed as Exempt | No | 0 | | | |
| D - Creditors Holding Secured Claims | Yes | 1 | | 0.00 | |
| E - Creditors Holding Unsecured Priority Claims (Total of Claims on Schedule E) | Yes | 2 | | 151,133.40 | |
| F - Creditors Holding Unsecured Nonpriority Claims | Yes | 3 | | 2,328,403.61 | |
| G - Executory Contracts and Unexpired Leases | Yes | 1 | | | |
| H - Codebtors | Yes | 1 | | | |
| I - Current Income of Individual Debtor(s) | No | 0 | | | N/A |
| J - Current Expenditures of Individual Debtor(s) | No | 0 | | | N/A |
| Total Number of Sheets of ALL Schedules | | 12 | | | |
| Total Assets | | | 501,134.79 | | |
| Total Liabilities | | | | 2,479,537.01 | |

**EXHIBIT A**

# United States Bankruptcy Court
## Central District of California

In re    **Silicon Valley Telecom Exchange, LLC** ,

           Debtor

Case No.    **14-52449**

Chapter         **11**

## STATISTICAL SUMMARY OF CERTAIN LIABILITIES AND RELATED DATA (28 U.S.C. § 159)

If you are an individual debtor whose debts are primarily consumer debts, as defined in § 101(8) of the Bankruptcy Code (11 U.S.C.§ 101(8)), filing a case under chapter 7, 11 or 13, you must report all information requested below.

☐   Check this box if you are an individual debtor whose debts are NOT primarily consumer debts. You are not required to report any information here.

**This information is for statistical purposes only under 28 U.S.C. § 159.**

**Summarize the following types of liabilities, as reported in the Schedules, and total them.**

| Type of Liability | Amount |
|---|---|
| Domestic Support Obligations (from Schedule E) | |
| Taxes and Certain Other Debts Owed to Governmental Units (from Schedule E) | |
| Claims for Death or Personal Injury While Debtor Was Intoxicated (from Schedule E) (whether disputed or undisputed) | |
| Student Loan Obligations (from Schedule F) | |
| Domestic Support, Separation Agreement, and Divorce Decree Obligations Not Reported on Schedule E | |
| Obligations to Pension or Profit-Sharing, and Other Similar Obligations (from Schedule F) | |
| TOTAL | |

**State the following:**

| | |
|---|---|
| Average Income (from Schedule I, Line 12) | |
| Average Expenses (from Schedule J, Line 22) | |
| Current Monthly Income (from Form 22A Line 12; OR, Form 22B Line 11; OR, Form 22C Line 20 ) | |

**State the following:**

| | | |
|---|---|---|
| 1. Total from Schedule D, "UNSECURED PORTION, IF ANY" column | | |
| 2. Total from Schedule E, "AMOUNT ENTITLED TO PRIORITY" column | | |
| 3. Total from Schedule E, "AMOUNT NOT ENTITLED TO PRIORITY, IF ANY" column | | |
| 4. Total from Schedule F | | |
| 5. Total of non-priority unsecured debt (sum of 1, 3, and 4) | | |


EXHIBIT A

In re     **Silicon Valley Telecom Exchange, LLC**       Case No.    **14-52449**
                             Debtor

# SCHEDULE A - REAL PROPERTY

Except as directed below, list all real property in which the debtor has any legal, equitable, or future interest, including all property owned as a cotenant, community property, or in which the debtor has a life estate. Include any property in which the debtor holds rights and powers exercisable for the debtor's own benefit. If the debtor is married, state whether husband, wife, both, or the marital community own the property by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community." If the debtor holds no interest in real property, write "None" under "Description and Location of Property."

**Do not include interests in executory contracts and unexpired leases on this schedule. List them in Schedule G - Executory Contracts and Unexpired Leases.**

If an entity claims to have a lien or hold a secured interest in any property, state the amount of the secured claim. See Schedule D. If no entity claims to hold a secured interest in the property, write "None" in the column labeled "Amount of Secured Claim." If the debtor is an individual or if a joint petition is filed, state the amount of any exemption claimed in the property only in Schedule C - Property Claimed as Exempt.

| Description and Location of Property | Nature of Debtor's Interest in Property | Husband, Wife, Joint, or Community | Current Value of Debtor's Interest in Property, without Deducting any Secured Claim or Exemption | Amount of Secured Claim |
|---|---|---|---|---|
| **None** | | | | |

| | | |
|---|---|---|
| | Sub-Total > | **0.00** (Total of this page) |
| | Total > | **0.00** |
| | | (Report also on Summary of Schedules) |

  **0**   continuation sheets attached to the Schedule of Real Property

Case: 14-52449    Doc# 11    Filed: 06/19/14    Entered: 06/19/14 17:26:05    Page 3 of 25

Case: 14-52449    Doc# 97    Filed: 01/20/15    Entered: 01/20/15 10:52:41    Page 12 of 73

EXHIBIT A

In re   **Silicon Valley Telecom Exchange, LLC**    ,    Case No.   **14-52449**

                                Debtor

# SCHEDULE B - PERSONAL PROPERTY

Except as directed below, list all personal property of the debtor of whatever kind. If the debtor has no property in one or more of the categories, place an "x" in the appropriate position in the column labeled "None." If additional space is needed in any category, attach a separate sheet properly identified with the case name, case number, and the number of the category. If the debtor is married, state whether husband, wife, both, or the marital community own the property by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community." If the debtor is an individual or a joint petition is filed, state the amount of any exemptions claimed only in Schedule C - Property Claimed as Exempt.

**Do not list interests in executory contracts and unexpired leases on this schedule. List them in Schedule G - Executory Contracts and Unexpired Leases.**

If the property is being held for the debtor by someone else, state that person's name and address under "Description and Location of Property."
If the property is being held for a minor child, simply state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. §112 and Fed. R. Bankr. P. 1007(m).

| Type of Property | N O N E | Description and Location of Property | Husband, Wife, Joint, or Community | Current Value of Debtor's Interest in Property, without Deducting any Secured Claim or Exemption |
|---|---|---|---|---|
| 1.   Cash on hand | X | | | |
| 2.   Checking, savings or other financial accounts, certificates of deposit, or shares in banks, savings and loan, thrift, building and loan, and homestead associations, or credit unions, brokerage houses, or cooperatives. | | **Checking account number ending in 6394, Bank of America, 1510 The Alameda, San Jose, CA 95126** | - | 204.79 |
| 3.   Security deposits with public utilities, telephone companies, landlords, and others. | | **Security deposit held by San Jose Unified School District, 855 Lenzen Avenue, San Jose, CA 95126** | - | 100,000.00 |
| 4.   Household goods and furnishings, including audio, video, and computer equipment. | X | | | |
| 5.   Books, pictures and other art objects, antiques, stamp, coin, record, tape, compact disc, and other collections or collectibles. | X | | | |
| 6.   Wearing apparel. | X | | | |
| 7.   Furs and jewelry. | X | | | |
| 8.   Firearms and sports, photographic, and other hobby equipment. | X | | | |
| 9.   Interests in insurance policies. Name insurance company of each policy and itemize surrender or refund value of each. | | **Property insurance with Commerce Property Insurance Services, 2630 Lacy Street, Los Angeles, CA 90031. No value.** | - | 0.00 |
| 10.   Annuities. Itemize and name each issuer. | X | | | |

                                               Sub-Total >      **100,204.79**

                                               (Total of this page)

__2__ continuation sheets attached to the Schedule of Personal Property

Case: 14-52449    Doc# 11    Filed: 06/19/14    Entered: 06/19/14 17:26:05    Page 4 of 25

Case: 14-52449    Doc# 97    Filed: 01/20/15    Entered: 01/20/15 10:52:41    Page 13 of 73

**EXHIBIT A**

In re    **Silicon Valley Telecom Exchange, LLC**         Case No.     **14-52449**

                                                        Debtor

# SCHEDULE B - PERSONAL PROPERTY
### (Continuation Sheet)

| Type of Property | N O N E | Description and Location of Property | Husband, Wife, Joint, or Community | Current Value of Debtor's Interest in Property, without Deducting any Secured Claim or Exemption |
|---|---|---|---|---|
| 11. Interests in an education IRA as defined in 26 U.S.C. § 530(b)(1) or under a qualified State tuition plan as defined in 26 U.S.C. § 529(b)(1). Give particulars. (File separately the record(s) of any such interest(s). 11 U.S.C. § 521(c).) | X | | | |
| 12. Interests in IRA, ERISA, Keogh, or other pension or profit sharing plans. Give particulars. | X | | | |
| 13. Stock and interests in incorporated and unincorporated businesses. Itemize. | X | | | |
| 14. Interests in partnerships or joint ventures. Itemize. | X | | | |
| 15. Government and corporate bonds and other negotiable and nonnegotiable instruments. | X | | | |
| 16. Accounts receivable. | | **Outstanding accounts receivables: rental and CAM charge income from tenants** | - | 198,930.00 |
| 17. Alimony, maintenance, support, and property settlements to which the debtor is or may be entitled. Give particulars. | X | | | |
| 18. Other liquidated debts owed to debtor including tax refunds. Give particulars. | X | | | |
| 19. Equitable or future interests, life estates, and rights or powers exercisable for the benefit of the debtor other than those listed in Schedule A - Real Property. | X | | | |
| 20. Contingent and noncontingent interests in estate of a decedent, death benefit plan, life insurance policy, or trust. | X | | | |
| 21. Other contingent and unliquidated claims of every nature, including tax refunds, counterclaims of the debtor, and rights to setoff claims. Give estimated value of each. | X | | | |

                                                           Sub-Total >       **198,930.00**
                                                      (Total of this page)

Sheet  **1**  of  **2**  continuation sheets attached
to the Schedule of Personal Property

**EXHIBIT A**

In re    **Silicon Valley Telecom Exchange, LLC**                              ,    Case No.    **14-52449**
                                                    Debtor

# SCHEDULE B - PERSONAL PROPERTY
### (Continuation Sheet)

| Type of Property | N O N E | Description and Location of Property | Husband, Wife, Joint, or Community | Current Value of Debtor's Interest in Property, without Deducting any Secured Claim or Exemption |
|---|---|---|---|---|
| 22. Patents, copyrights, and other intellectual property. Give particulars. | X | | | |
| 23. Licenses, franchises, and other general intangibles. Give particulars. | X | | | |
| 24. Customer lists or other compilations containing personally identifiable information (as defined in 11 U.S.C. § 101(41A)) provided to the debtor by individuals in connection with obtaining a product or service from the debtor primarily for personal, family, or household purposes. | X | | | |
| 25. Automobiles, trucks, trailers, and other vehicles and accessories. | X | | | |
| 26. Boats, motors, and accessories. | X | | | |
| 27. Aircraft and accessories. | X | | | |
| 28. Office equipment, furnishings, and supplies. | | 3 computers, 3 monitors, 20 workstations, 5 chairs | - | 2,000.00 |
| 29. Machinery, fixtures, equipment, and supplies used in business. | | 3 Generators ($150,000); UPS, AC, load banks, switch gear ($50,000) | - | 200,000.00 |
| 30. Inventory. | X | | | |
| 31. Animals. | X | | | |
| 32. Crops - growing or harvested. Give particulars. | X | | | |
| 33. Farming equipment and implements. | X | | | |
| 34. Farm supplies, chemicals, and feed. | X | | | |
| 35. Other personal property of any kind not already listed. Itemize. | X | | | |

|  | |
|---|---|
| Sub-Total > | 202,000.00 |
| (Total of this page) | |
| Total > | 501,134.79 |

Sheet __2__ of __2__ continuation sheets attached
to the Schedule of Personal Property

(Report also on Summary of Schedules)

Case: 14-52449    Doc# 11    Filed: 06/19/14    Entered: 06/19/14 17:26:05    Page 6 of 25

Case: 14-52449    Doc# 97    Filed: 01/20/15    Entered: 01/20/15 10:52:41    Page 15 of 73

**EXHIBIT A**

In re   **Silicon Valley Telecom Exchange, LLC**            ,     Case No.   **14-52449**

                                       Debtor

# SCHEDULE D - CREDITORS HOLDING SECURED CLAIMS

State the name, mailing address, including zip code, and last four digits of any account number of all entities holding claims secured by property of the debtor as of the date of filing of the petition. The complete account number of any account the debtor has with the creditor is useful to the trustee and the creditor and may be provided if the debtor chooses to do so. List creditors holding all types of secured interests such as judgment liens, garnishments, statutory liens, mortgages, deeds of trust, and other security interests.

List creditors in alphabetical order to the extent practicable. If a minor child is a creditor, the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. §112 and Fed. R. Bankr. P. 1007(m). If all secured creditors will not fit on this page, use the continuation sheet provided.

If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column labeled "Codebtor" ,include the entity on the appropriate schedule of creditors, and complete Schedule H - Codebtors. If a joint petition is filed, state whether the husband, wife, both of them, or the marital community may be liable on each claim by placing an "H", "W", "J", or "C" in the column labeled "Husband, Wife, Joint, or Community".

If the claim is contingent, place an "X" in the column labeled "Contingent". If the claim is unliquidated, place an "X" in the column labeled "Unliquidated". If the claim is disputed, place an "X" in the column labeled "Disputed". (You may need to place an "X" in more than one of these three columns.)

Total the columns labeled "Amount of Claim Without Deducting Value of Collateral" and "Unsecured Portion, if Any" in the boxes labeled "Total(s)" on the last sheet of the completed schedule. Report the total from the column labeled "Amount of Claim" also on the Summary of Schedules and, if the debtor is an individual with primarily consumer debts, report the total from the column labeled "Unsecured Portion" on the Statistical Summary of Certain Liabilities and Related Data.

■  Check this box if debtor has no creditors holding secured claims to report on this Schedule D.

| CREDITOR'S NAME AND MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER (See instructions above.) | C O D E B T O R | Husband, Wife, Joint, or Community | | | DATE CLAIM WAS INCURRED, NATURE OF LIEN, AND DESCRIPTION AND VALUE OF PROPERTY SUBJECT TO LIEN | C O N T I N G E N T | U N L I Q U I D A T E D | D I S P U T E D | AMOUNT OF CLAIM WITHOUT DEDUCTING VALUE OF COLLATERAL | UNSECURED PORTION, IF ANY |
|---|---|---|---|---|---|---|---|---|---|---|
| | | H | W J | C | | | | | | |
| Account No. | | | | | | | | | | |
| | | | | | Value $ | | | | | |
| Account No. | | | | | | | | | | |
| | | | | | Value $ | | | | | |
| Account No. | | | | | | | | | | |
| | | | | | Value $ | | | | | |
| Account No. | | | | | | | | | | |
| | | | | | Value $ | | | | | |
| __0__ continuation sheets attached | | | | | Subtotal (Total of this page) | | | | | |
| | | | | | Total (Report on Summary of Schedules) | | | | 0.00 | 0.00 |

Case: 14-52449   Doc# 11   Filed: 06/19/14   Entered: 06/19/14 17:26:05   Page 7 of 25

Case: 14-52449   Doc# 97   Filed: 01/20/15   Entered: 01/20/15 10:52:41   Page 16 of 73

**EXHIBIT A**

.

In re   **Silicon Valley Telecom Exchange, LLC**          Case No.   **14-52449**

                                      Debtor

# SCHEDULE E - CREDITORS HOLDING UNSECURED PRIORITY CLAIMS

A complete list of claims entitled to priority, listed separately by type of priority, is to be set forth on the sheets provided. Only holders of unsecured claims entitled to priority should be listed in this schedule. In the boxes provided on the attached sheets, state the name, mailing address, including zip code, and last four digits of the account number, if any, of all entities holding priority claims against the debtor or the property of the debtor, as of the date of the filing of the petition. Use a separate continuation sheet for each type of priority and label each with the type of priority.

The complete account number of any account the debtor has with the creditor is useful to the trustee and the creditor and may be provided if the debtor chooses to do so. If a minor child is a creditor, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. §112 and Fed. R. Bankr. P. 1007(m).

If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column labeled "Codebtor," include the entity on the appropriate schedule of creditors, and complete Schedule H-Codebtors. If a joint petition is filed, state whether the husband, wife, both of them, or the marital community may be liable on each claim by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community." If the claim is contingent, place an "X" in the column labeled "Contingent." If the claim is unliquidated, place an "X" in the column labeled "Unliquidated." If the claim is disputed, place an "X" in the column labeled "Disputed." (You may need to place an "X" in more than one of these three columns.)

Report the total of claims listed on each sheet in the box labeled "Subtotals" on each sheet. Report the total of all claims listed on this Schedule E in the box labeled "Total" on the last sheet of the completed schedule. Report this total also on the Summary of Schedules.

Report the total of amounts entitled to priority listed on each sheet in the box labeled "Subtotals" on each sheet. Report the total of all amounts entitled to priority listed on this Schedule E in the box labeled "Totals" on the last sheet of the completed schedule. Individual debtors with primarily consumer debts report this total also on the Statistical Summary of Certain Liabilities and Related Data.

Report the total of amounts not entitled to priority listed on each sheet in the box labeled "Subtotals" on each sheet. Report the total of all amounts not entitled to priority listed on this Schedule E in the box labeled "Totals" on the last sheet of the completed schedule. Individual debtors with primarily consumer debts report this total also on the Statistical Summary of Certain Liabilities and Related Data.

☐ Check this box if debtor has no creditors holding unsecured priority claims to report on this Schedule E.

**TYPES OF PRIORITY CLAIMS** (Check the appropriate box(es) below if claims in that category are listed on the attached sheets)

☐ **Domestic support obligations**

Claims for domestic support that are owed to or recoverable by a spouse, former spouse, or child of the debtor, or the parent, legal guardian, or responsible relative of such a child, or a governmental unit to whom such a domestic support claim has been assigned to the extent provided in 11 U.S.C. § 507(a)(1).

☐ **Extensions of credit in an involuntary case**

Claims arising in the ordinary course of the debtor's business or financial affairs after the commencement of the case but before the earlier of the appointment of a trustee or the order for relief. 11 U.S.C. § 507(a)(3).

☐ **Wages, salaries, and commissions**

Wages, salaries, and commissions, including vacation, severance, and sick leave pay owing to employees and commissions owing to qualifying independent sales representatives up to $12,475* per person earned within 180 days immediately preceding the filing of the original petition, or the cessation of business, whichever occurred first, to the extent provided in 11 U.S.C. § 507(a)(4).

☐ **Contributions to employee benefit plans**

Money owed to employee benefit plans for services rendered within 180 days immediately preceding the filing of the original petition, or the cessation of business, whichever occurred first, to the extent provided in 11 U.S.C. § 507(a)(5).

☐ **Certain farmers and fishermen**

Claims of certain farmers and fishermen, up to $6,150* per farmer or fisherman, against the debtor, as provided in 11 U.S.C. § 507(a)(6).

☐ **Deposits by individuals**

Claims of individuals up to $2,775* for deposits for the purchase, lease, or rental of property or services for personal, family, or household use, that were not delivered or provided. 11 U.S.C. § 507(a)(7).

■ **Taxes and certain other debts owed to governmental units**

Taxes, customs duties, and penalties owing to federal, state, and local governmental units as set forth in 11 U.S.C. § 507(a)(8).

☐ **Commitments to maintain the capital of an insured depository institution**

Claims based on commitments to the FDIC, RTC, Director of the Office of Thrift Supervision, Comptroller of the Currency, or Board of Governors of the Federal Reserve System, or their predecessors or successors, to maintain the capital of an insured depository institution. 11 U.S.C. § 507 (a)(9).

☐ **Claims for death or personal injury while debtor was intoxicated**

Claims for death or personal injury resulting from the operation of a motor vehicle or vessel while the debtor was intoxicated from using alcohol, a drug, or another substance. 11 U.S.C. § 507(a)(10).

*\* Amount subject to adjustment on 4/01/16, and every three years thereafter with respect to cases commenced on or after the date of adjustment.*

**EXHIBIT A**

In re **Silicon Valley Telecom Exchange, LLC**                    , Case No. __14-52449__
_____
Debtor

# SCHEDULE E - CREDITORS HOLDING UNSECURED PRIORITY CLAIMS
### (Continuation Sheet)

**Taxes and Certain Other Debts**
**Owed to Governmental Units**

TYPE OF PRIORITY

| CREDITOR'S NAME, AND MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER (See instructions.) | C O D E B T O R | Husband, Wife, Joint, or Community | | | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM | C O N T I N G E N T | U N L I Q U I D A T E D | D I S P U T E D | AMOUNT OF CLAIM | AMOUNT NOT ENTITLED TO PRIORITY, IF ANY |
|---|---|---|---|---|---|---|---|---|---|---|
| | | H | J | W C | | | | | | AMOUNT ENTITLED TO PRIORITY |
| Account No. **xx-xxx0895** | | | | | 06/2014 | | | | | |
| Creditor #: 1 Franchise Tax Board P.O. Box 942857 Sacramento, CA 94257-0531 | - | | | | Estimated fee for LLC | | | | | 0.00 |
| | | | | | | | | | 6,000.00 | 6,000.00 |
| Account No. **xx-xxx355-1** | | | | | 05/2013 | | | | | |
| Creditor #: 2 Tax Collector, Santa Clara County County Government Center, East Wing 70 West Hedding Street San Jose, CA 95110-1767 | - | | | | Escape assessments for property taxes | | | | | 0.00 |
| | | | | | | | | | 52,150.00 | 52,150.00 |
| Account No. **xx-xxx265-1** | | | | | 01/2014 | | | | | |
| Creditor #: 3 Tax Collector, Santa Clara County County Government Center, East Wing 70 West Hedding Street San Jose, CA 95110-1767 | - | | | | Escape assessments for property taxes | | | | | 0.00 |
| | | | | | | | | | 83,183.40 | 83,183.40 |
| Account No. **xxxxxx-x001-7** | | | | | 05/2014 | | | | | |
| Creditor #: 4 Tax Collector, Santa Clara County County Government Center, East Wing 70 West Hedding Street San Jose, CA 95110-1767 | - | | | | Escape assessments for property taxes | | | X | | 0.00 |
| | | | | | | | | | 9,800.00 | 9,800.00 |
| Account No. | | | | | | | | | | |
| | | | | | | | | | | |

Sheet __1__ of __1__ continuation sheets attached to
Schedule of Creditors Holding Unsecured Priority Claims

| | | |
|---|---|---|
| Subtotal | 0.00 | |
| (Total of this page) | 151,133.40 | 151,133.40 |
| Total | 0.00 | |
| (Report on Summary of Schedules) | 151,133.40 | 151,133.40 |

B6F (Official Form 6F) (12/07)

In re **Silicon Valley Telecom Exchange, LLC**,     Case No. **14-52449**

Debtor

# SCHEDULE F - CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS

State the name, mailing address, including zip code, and last four digits of any account number, of all entities holding unsecured claims without priority against the debtor or the property of the debtor, as of the date of filing of the petition. The complete account number of any account the debtor has with the creditor is useful to the trustee and the creditor and may be provided if the debtor chooses to do so. If a minor child is a creditor, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. §112 and Fed. R. Bankr. P. 1007(m). Do not include claims listed in Schedules D and E. If all creditors will not fit on this page, use the continuation sheet provided.

If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column labeled "Codebtor," include the entity on the appropriate schedule of creditors, and complete Schedule H - Codebtors. If a joint petition is filed, state whether the husband, wife, both of them, or the marital community may be liable on each claim by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community."

If the claim is contingent, place an "X" in the column labeled "Contingent." If the claim is unliquidated, place an "X" in the column labeled "Unliquidated." If the claim is disputed, place an "X" in the column labeled "Disputed." (You may need to place an "X" in more than one of these three columns.)

Report the total of all claims listed on this schedule in the box labeled "Total" on the last sheet of the completed schedule. Report this total also on the Summary of Schedules and, if the debtor is an individual with primarily consumer debts, report this total also on the Statistical Summary of Certain Liabilities and Related Data.

☐ Check this box if debtor has no creditors holding unsecured claims to report on this Schedule F.

| CREDITOR'S NAME, MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER (See instructions above.) | CODEBTOR | Husband, Wife, Joint, or Community | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE. | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|---|
| Account No. **Silicon Valley Telecom Exchg** <br><br> Creditor #: 1 <br> Campeau, Goodsell & Smith <br> Attn: Scott Goodsell <br> 440 N. 1st Street, Suite 100 <br> San Jose, CA 95112 | | - | 09/2008 <br> Legal fees | | | | 379,420.10 |
| Account No. **Silicon Valley Telecom Exchg** <br><br> Creditor #: 2 <br> CB Richard Ellis, Inc. <br> Ellis Reiter, Esq. <br> 355 S. Grand Avenue, Suite 1200 <br> Los Angeles, CA 90071 | | - | 09/2008 <br> Real estate commission | | | | 65,435.09 |
| Account No. **None** <br><br> Creditor #: 3 <br> Fred Rubio <br> 308 Casitas Bulevar <br> Los Gatos, CA 95032 | | - | 04/199-05/2014 <br> Loans to company to start up and maintain business | | | | 831,290.31 |
| Account No. **Silicon Valley Telecom Exchg** <br><br> Creditor #: 4 <br> Granite Capital Investments, Inc. <br> Law Office of Gilbert Khachadouria <br> 3455 American River Drive, Suite C <br> Sacramento, CA 95864 | | - | 09/2008 <br> Consulting fees | | | | 102,245.52 |
| **2** continuation sheets attached | | | Subtotal <br> (Total of this page) | | | | 1,378,391.02 |

Software Copyright (c) 1996-2013 - Best Case, LLC - www.bestcase.com     S/N:37145-140611    Best Case Bankruptcy


EXHIBIT A

In re **Silicon Valley Telecom Exchange, LLC**                    Case No. **14-52449**
_____,
Debtor

# SCHEDULE F - CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS
### (Continuation Sheet)

| CREDITOR'S NAME, MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER (See instructions above.) | C O D E B T O R | H W J C | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE. | C O N T I N G E N T | U N L I Q U I D A T E D | D I S P U T E D | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|---|
| Account No. **Silicon Valley Telecom Exchg** <br><br> **Creditor #: 5** <br> **Law Office of Ed Cullen** <br> **110 N. Third Street** <br> **San Jose, CA 95112** | | - | 09/2013 <br> Legal fees | | | | 87,000.00 |
| Account No. **Silicon Valley Telecom Exchg** <br><br> **Creditor #: 6** <br> **Law Office of Marc L. Pinckney** <br> **8677 Villa La Jolla Drive, Ste 230** <br> **La Jolla, CA 92037** | X | - | 04/2014 <br> Legal fees | | | | 14,940.00 |
| Account No. **Silicon Valley Telecom Exchg** <br><br> **Creditor #: 7** <br> **Michael Oaks** <br> **1316 W. York Avenue** <br> **Enid, OK 73703** | | - | 09/2008 <br> Consulting fees | | | | 30,000.00 |
| Account No. **Silicon Valley Telecom Exchg** <br><br> **Creditor #: 8** <br> **Orlando, Mitts, Moore & Company** <br> **675 N. First Street, Suite 1200** <br> **San Jose, CA 95112** | | - | 01/2014-05/2014 <br> Accounting fees | | | | 3,646.47 |
| Account No. **xxxxxxx023-8** <br><br> **Creditor #: 9** <br> **PG&E** <br> **Box 997300** <br> **Sacramento, CA 95899-7300** | | - | 05/2014 <br> Utility | | | | 84,194.42 |

Sheet no. __1__ of __2__ sheets attached to Schedule of
Creditors Holding Unsecured Nonpriority Claims

Subtotal
(Total of this page)

219,780.89



EXHIBIT A

B6F (Official Form 6F) (12/07) - Cont.

In re **Silicon Valley Telecom Exchange, LLC** , Case No. **14-52449**
_____
Debtor

## SCHEDULE F - CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS
(Continuation Sheet)

| CREDITOR'S NAME, MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER (See instructions above.) | C O D E B T O R | Husband, Wife, Joint, or Community | | | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE. | C O N T I N G E N T | U N L I Q U I D A T E D | D I S P U T E D | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|---|---|---|
| | | H | W J | C | | | | | |
| Account No. **Silicon Valley Telecom Exchg**<br><br>**Creditor #: 10**<br>**Phyllis Pollack, Trustee for CBI Cr**<br>**865 Figueroa Street**<br>**Suite 1388**<br>**Los Angeles, CA 90017** | | - | | | 09/2008<br>Construction/legal expenses | | | | 500,000.00 |
| Account No. **xxxxxxx5177**<br><br>**Creditor #: 11**<br>**San Jose Unified School District**<br>**Attn: Sue Avila and Arlene Ehrlich**<br>**855 Lenzen Avenue**<br>**San Jose, CA 95126** | | - | | | 05/2014<br>Back rent | | | | 200,878.20 |
| Account No. **Silicon Valley Telecom Exchg**<br><br>**Creditor #: 12**<br>**Silicon Valley Law Group**<br>**25 Metro Drive, Suite 600**<br>**San Jose, CA 95110** | | - | | | 09/2013<br>Legal fees | | | | 19,353.50 |
| Account No. **Silicon Valley Telecom Exchg**<br><br>**Creditor #: 13**<br>**Todd Rothbard**<br>**100 Saratoga Avenue #200**<br>**Santa Clara, CA 95051** | | - | | | 12/2013<br>Legal fees | | | | 10,000.00 |
| Account No. | | | | | | | | | |

| | | |
|---|---|---|
| Sheet no. **2** of **2** sheets attached to Schedule of Creditors Holding Unsecured Nonpriority Claims | Subtotal<br>(Total of this page) | 730,231.70 |
| | Total<br>(Report on Summary of Schedules) | 2,328,403.61 |

Software Copyright (c) 1996-2013 - Best Case, LLC - www.bestcase.com

Best Case Bankruptcy


EXHIBIT A

In re   **Silicon Valley Telecom Exchange, LLC**       Case No.   **14-52449**

                                Debtor

# SCHEDULE G - EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Describe all executory contracts of any nature and all unexpired leases of real or personal property. Include any timeshare interests. State nature of debtor's interest in contract, i.e., "Purchaser", "Agent", etc. State whether debtor is the lessor or lessee of a lease. Provide the names and complete mailing addresses of all other parties to each lease or contract described. If a minor child is a party to one of the leases or contracts, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. §112 and Fed. R. Bankr. P. 1007(m).

☐ Check this box if debtor has no executory contracts or unexpired leases.

| Name and Mailing Address, Including Zip Code, of Other Parties to Lease or Contract | Description of Contract or Lease and Nature of Debtor's Interest. State whether lease is for nonresidential real property. State contract number of any government contract. |
|---|---|
| **RAIX**<br>**250 Stockton Avenue**<br>**San Jose, CA 95126** | **Sublease between Debtor and RAIX for partial space located at 250 Stockton Avenue, San Jose, CA 95126. Debtor is Lessor. Lease expires April 30, 2024.** |
| **San Jose Unified School District**<br>**Attn: Arlene Ehrlich**<br>**855 Lenzen Avenue**<br>**San Jose, CA 95126** | **Commercial lease for real property located at 250 Stockton Avenue, San Jose, CA 95126. Debtor is Lessee. Lease expires April 30, 2014.** |
| **Silicon Valley Telecom**<br>**& Internet Exchange**<br>**250 Stockton Avenue**<br>**San Jose, CA 95126** | **Sublease between Debtor and Silicon Valley Telecom for partial space located at 250 Stockton Avenue, San Jose, CA 95126. Debtor is Lessor. Lease expires April 30, 2014.** |

**0**
    continuation sheets attached to Schedule of Executory Contracts and Unexpired Leases

EXHIBIT A

In re    **Silicon Valley Telecom Exchange, LLC**                Case No.   **14-52449**

                                    Debtor

# SCHEDULE H - CODEBTORS

Provide the information requested concerning any person or entity, other than a spouse in a joint case, that is also liable on any debts listed by debtor in the schedules of creditors. Include all guarantors and co-signers. If the debtor resides or resided in a community property state, commonwealth, or territory (including Alaska, Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Puerto Rico, Texas, Washington, or Wisconsin) within the eight year period immediately preceding the commencement of the case, identify the name of the debtor's spouse and of any former spouse who resides or resided with the debtor in the community property state, commonwealth, or territory. Include all names used by the nondebtor spouse during the eight years immediately preceding the commencement of this case. If a minor child is a codebtor or a creditor, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. §112 and Fed. R. Bankr. P. 1007(m).

☐  Check this box if debtor has no codebtors.

| NAME AND ADDRESS OF CODEBTOR | NAME AND ADDRESS OF CREDITOR |
|---|---|
| **Silicon Valley Telecom &**<br>**Internet Exchange, LLC**<br>**250 Stockton Avenue**<br>**San Jose, CA 95126** | **Law Office of Marc L. Pinckney**<br>**8677 Villa La Jolla Drive, Ste 230**<br>**La Jolla, CA 92037** |

**0**

EXHIBIT A

B6 Declaration (Official Form 6 - Declaration). (12/07)

# United States Bankruptcy Court
## Central District of California

In re    **Silicon Valley Telecom Exchange, LLC**

Debtor(s)

Case No.    **14-52449**

Chapter    **11**

## DECLARATION CONCERNING DEBTOR'S SCHEDULES

### DECLARATION UNDER PENALTY OF PERJURY ON BEHALF OF CORPORATION OR PARTNERSHIP

       I, the Managing Member of the corporation named as debtor in this case, declare under penalty of perjury that I have read the foregoing summary and schedules, consisting of   **14**   sheets, and that they are true and correct to the best of my knowledge, information, and belief.

Date    **June 18, 2014**

Signature    **/s/ Fred D. Rubio**

**Fred D. Rubio**

**Managing Member**

*Penalty for making a false statement or concealing property:* Fine of up to $500,000 or imprisonment for up to 5 years or both. 18 U.S.C. §§ 152 and 3571.

**EXHIBIT A**

B7 (Official Form 7) (04/13)

# United States Bankruptcy Court
## Central District of California

In re  **Silicon Valley Telecom Exchange, LLC**                    Case No.  **14-52449**

Debtor(s)                              Chapter  **11**

# STATEMENT OF FINANCIAL AFFAIRS

This statement is to be completed by every debtor. Spouses filing a joint petition may file a single statement on which the information for both spouses is combined. If the case is filed under chapter 12 or chapter 13, a married debtor must furnish information for both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed. An individual debtor engaged in business as a sole proprietor, partner, family farmer, or self-employed professional, should provide the information requested on this statement concerning all such activities as well as the individual's personal affairs. To indicate payments, transfers and the like to minor children, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. § 112; Fed. R. Bankr. P. 1007(m).

Questions 1 - 18 are to be completed by all debtors. Debtors that are or have been in business, as defined below, also must complete Questions 19 - 25. **If the answer to an applicable question is "None," mark the box labeled "None."** If additional space is needed for the answer to any question, use and attach a separate sheet properly identified with the case name, case number (if known), and the number of the question.

### DEFINITIONS

*"In business."* A debtor is "in business" for the purpose of this form if the debtor is a corporation or partnership. An individual debtor is "in business" for the purpose of this form if the debtor is or has been, within six years immediately preceding the filing of this bankruptcy case, any of the following: an officer, director, managing executive, or owner of 5 percent or more of the voting or equity securities of a corporation; a partner, other than a limited partner, of a partnership; a sole proprietor or self-employed full-time or part-time. An individual debtor also may be "in business" for the purpose of this form if the debtor engages in a trade, business, or other activity, other than as an employee, to supplement income from the debtor's primary employment.

*"Insider."* The term "insider" includes but is not limited to: relatives of the debtor; general partners of the debtor and their relatives; corporations of which the debtor is an officer, director, or person in control; officers, directors, and any persons in control of a corporate debtor and their relatives; affiliates of the debtor and insiders of such affiliates; and any managing agent of the debtor. 11 U.S.C. § 101(2), (31).

---

**1. Income from employment or operation of business**

None
☐

State the gross amount of income the debtor has received from employment, trade, or profession, or from operation of the debtor's business, including part-time activities either as an employee or in independent trade or business, from the beginning of this calendar year to the date this case was commenced. State also the gross amounts received during the **two years** immediately preceding this calendar year. (A debtor that maintains, or has maintained, financial records on the basis of a fiscal rather than a calendar year may report fiscal year income. Identify the beginning and ending dates of the debtor's fiscal year.) If a joint petition is filed, state income for each spouse separately. (Married debtors filing under chapter 12 or chapter 13 must state income of both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| AMOUNT | SOURCE |
|--------|--------|
| **$539,923.00** | **2014 YTD: Operation of Business** |
| **$1,206,049.00** | **2013: Operation of Business** |
| **$1,517,531.00** | **2012: Operation of Business** |

---

**2. Income other than from employment or operation of business**

None
■

State the amount of income received by the debtor other than from employment, trade, profession, or operation of the debtor's business during the **two years** immediately preceding the commencement of this case. Give particulars. If a joint petition is filed, state income for each spouse separately. (Married debtors filing under chapter 12 or chapter 13 must state income for each spouse whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

AMOUNT                              SOURCE

Software Copyright (c) 1996-2014 Best Case, LLC - www.bestcase.com                    Best Case Bankruptcy

**EXHIBIT A**

**3. Payments to creditors**

None
■    *Complete a. or b., as appropriate, and c.*

     a.    *Individual or joint debtor(s) with primarily consumer debts:* List all payments on loans, installment purchases of goods or services, and other debts to any creditor made within **90 days** immediately preceding the commencement of this case unless the aggregate value of all property that constitutes or is affected by such transfer is less than $600. Indicate with an asterisk (*) any payments that were made to a creditor on account of a domestic support obligation or as part of an alternative repayment schedule under a plan by an approved nonprofit budgeting and credit counseling agency. (Married debtors filing under chapter 12 or chapter 13 must include payments by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF CREDITOR | DATES OF PAYMENTS | AMOUNT PAID | AMOUNT STILL OWING |
|---|---|---|---|

None
☐    b.    *Debtor whose debts are not primarily consumer debts:* List each payment or other transfer to any creditor made within **90 days** immediately preceding the commencement of the case unless the aggregate value of all property that constitutes or is affected by such transfer is less than $6,225*. If the debtor is an individual, indicate with an asterisk (*) any payments that were made to a creditor on account of a domestic support obligation or as part of an alternative repayment schedule under a plan by an approved nonprofit budgeting and credit counseling agency. (Married debtors filing under chapter 12 or chapter 13 must include payments and other transfers by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF CREDITOR | DATES OF PAYMENTS/ TRANSFERS | AMOUNT PAID OR VALUE OF TRANSFERS | AMOUNT STILL OWING |
|---|---|---|---|
| **Tax Collector, Santa Clara County County Government Center, East Wing 70 West Hedding Street San Jose, CA 95110-1767** | **03/2014, 04/2014 & 05/2014** | **$15,000.00** | **$47,290.00** |
| **San Jose Unified School District Attn: Arlene Ehrlich 855 Lenzen Avenue San Jose, CA 95126** | **04/2014 & 05/2014** | **$130,969.00** | **$200,878.00** |
| **PG&E 111 Alamden Blvd San Jose, CA 95113** | **04/2014, 05/2014 & 06/2014** | **$99,000.00** | **$84,194.00** |

None
■    c.    *All debtors:* List all payments made within **one year** immediately preceding the commencement of this case to or for the benefit of creditors who are or were insiders. (Married debtors filing under chapter 12 or chapter 13 must include payments by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF CREDITOR AND RELATIONSHIP TO DEBTOR | DATE OF PAYMENT | AMOUNT PAID | AMOUNT STILL OWING |
|---|---|---|---|

**4. Suits and administrative proceedings, executions, garnishments and attachments**

None
☐    a. List all suits and administrative proceedings to which the debtor is or was a party within **one year** immediately preceding the filing of this bankruptcy case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| CAPTION OF SUIT AND CASE NUMBER | NATURE OF PROCEEDING | COURT OR AGENCY AND LOCATION | STATUS OR DISPOSITION |
|---|---|---|---|
| **Silicon Valley Telecom Exchange, Inc. vs. Verio Case no. CV12-00899HRL** | **Breach of Contract** | **United States District Court Northern District 450 Golden Gate Ave. San Francisco, CA 94102** | **Case settled September 2013** |

*Amount subject to adjustment on 4/01/16, and every three years thereafter with respect to cases commenced on or after the date of adjustment.*

| CAPTION OF SUIT AND CASE NUMBER | NATURE OF PROCEEDING | COURT OR AGENCY AND LOCATION | STATUS OR DISPOSITION |
|---|---|---|---|
| **San Jose Unified School District vs. Silicon Valley Telecon Exchange Case no. 113CV255177** | **Unlawful Detainer/Eviction** | **Superior Court of California County of Santa Clara 191 N. First Street San Jose, CA 95113** | **Case settled April 2014** |

None ■    b. Describe all property that has been attached, garnished or seized under any legal or equitable process within **one year** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning property of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF PERSON FOR WHOSE BENEFIT PROPERTY WAS SEIZED | DATE OF SEIZURE | DESCRIPTION AND VALUE OF PROPERTY |
|---|---|---|

### 5. Repossessions, foreclosures and returns

None ■    List all property that has been repossessed by a creditor, sold at a foreclosure sale, transferred through a deed in lieu of foreclosure or returned to the seller, within **one year** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning property of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF CREDITOR OR SELLER | DATE OF REPOSSESSION, FORECLOSURE SALE, TRANSFER OR RETURN | DESCRIPTION AND VALUE OF PROPERTY |
|---|---|---|

### 6. Assignments and receiverships

None ■    a. Describe any assignment of property for the benefit of creditors made within **120 days** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include any assignment by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF ASSIGNEE | DATE OF ASSIGNMENT | TERMS OF ASSIGNMENT OR SETTLEMENT |
|---|---|---|

None ■    b. List all property which has been in the hands of a custodian, receiver, or court-appointed official within **one year** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning property of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF CUSTODIAN | NAME AND LOCATION OF COURT CASE TITLE & NUMBER | DATE OF ORDER | DESCRIPTION AND VALUE OF PROPERTY |
|---|---|---|---|

### 7. Gifts

None ■    List all gifts or charitable contributions made within **one year** immediately preceding the commencement of this case except ordinary and usual gifts to family members aggregating less than $200 in value per individual family member and charitable contributions aggregating less than $100 per recipient. (Married debtors filing under chapter 12 or chapter 13 must include gifts or contributions by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF PERSON OR ORGANIZATION | RELATIONSHIP TO DEBTOR, IF ANY | DATE OF GIFT | DESCRIPTION AND VALUE OF GIFT |
|---|---|---|---|

**EXHIBIT A**

### 8. Losses

None
■

List all losses from fire, theft, other casualty or gambling within **one year** immediately preceding the commencement of this case **or since the commencement of this case.** (Married debtors filing under chapter 12 or chapter 13 must include losses by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| DESCRIPTION AND VALUE OF PROPERTY | DESCRIPTION OF CIRCUMSTANCES AND, IF LOSS WAS COVERED IN WHOLE OR IN PART BY INSURANCE, GIVE PARTICULARS | DATE OF LOSS |
| --- | --- | --- |

### 9. Payments related to debt counseling or bankruptcy

None
☐

List all payments made or property transferred by or on behalf of the debtor to any persons, including attorneys, for consultation concerning debt consolidation, relief under the bankruptcy law or preparation of the petition in bankruptcy within **one year** immediately preceding the commencement of this case.

| NAME AND ADDRESS OF PAYEE | DATE OF PAYMENT, NAME OF PAYER IF OTHER THAN DEBTOR | AMOUNT OF MONEY OR DESCRIPTION AND VALUE OF PROPERTY |
| --- | --- | --- |
| **Law Office of Marc L. Pinckney**<br>**8677 Villa La Jolla Drive, Suite 230**<br>**La Jolla, CA 92037** | **June 2014** | **$10,000.00** |

### 10. Other transfers

None
■

a. List all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within **two years** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include transfers by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF TRANSFEREE, RELATIONSHIP TO DEBTOR | DATE | DESCRIBE PROPERTY TRANSFERRED AND VALUE RECEIVED |
| --- | --- | --- |

None
■

b. List all property transferred by the debtor within **ten years** immediately preceding the commencement of this case to a self-settled trust or similar device of which the debtor is a beneficiary.

| NAME OF TRUST OR OTHER DEVICE | DATE(S) OF TRANSFER(S) | AMOUNT OF MONEY OR DESCRIPTION AND VALUE OF PROPERTY OR DEBTOR'S INTEREST IN PROPERTY |
| --- | --- | --- |

### 11. Closed financial accounts

None
■

List all financial accounts and instruments held in the name of the debtor or for the benefit of the debtor which were closed, sold, or otherwise transferred within **one year** immediately preceding the commencement of this case. Include checking, savings, or other financial accounts, certificates of deposit, or other instruments; shares and share accounts held in banks, credit unions, pension funds, cooperatives, associations, brokerage houses and other financial institutions. (Married debtors filing under chapter 12 or chapter 13 must include information concerning accounts or instruments held by or for either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF INSTITUTION | TYPE OF ACCOUNT, LAST FOUR DIGITS OF ACCOUNT NUMBER, AND AMOUNT OF FINAL BALANCE | AMOUNT AND DATE OF SALE OR CLOSING |
| --- | --- | --- |

**EXHIBIT A**

**12. Safe deposit boxes**

None
■

List each safe deposit or other box or depository in which the debtor has or had securities, cash, or other valuables within **one year** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include boxes or depositories of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF BANK OR OTHER DEPOSITORY | NAMES AND ADDRESSES OF THOSE WITH ACCESS TO BOX OR DEPOSITORY | DESCRIPTION OF CONTENTS | DATE OF TRANSFER OR SURRENDER, IF ANY |
|---|---|---|---|

**13. Setoffs**

None
■

List all setoffs made by any creditor, including a bank, against a debt or deposit of the debtor within **90 days** preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF CREDITOR | DATE OF SETOFF | AMOUNT OF SETOFF |
|---|---|---|

**14. Property held for another person**

None
■

List all property owned by another person that the debtor holds or controls.

| NAME AND ADDRESS OF OWNER | DESCRIPTION AND VALUE OF PROPERTY | LOCATION OF PROPERTY |
|---|---|---|

**15. Prior address of debtor**

None
■

If the debtor has moved within **three years** immediately preceding the commencement of this case, list all premises which the debtor occupied during that period and vacated prior to the commencement of this case. If a joint petition is filed, report also any separate address of either spouse.

| ADDRESS | NAME USED | DATES OF OCCUPANCY |
|---|---|---|

**16. Spouses and Former Spouses**

None
■

If the debtor resides or resided in a community property state, commonwealth, or territory (including Alaska, Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Puerto Rico, Texas, Washington, or Wisconsin) within **eight years** immediately preceding the commencement of the case, identify the name of the debtor's spouse and of any former spouse who resides or resided with the debtor in the community property state.

NAME

**17. Environmental Information.**

For the purpose of this question, the following definitions apply:

"Environmental Law" means any federal, state, or local statute or regulation regulating pollution, contamination, releases of hazardous or toxic substances, wastes or material into the air, land, soil, surface water, groundwater, or other medium, including, but not limited to, statutes or regulations regulating the cleanup of these substances, wastes, or material.

"Site" means any location, facility, or property as defined under any Environmental Law, whether or not presently or formerly owned or operated by the debtor, including, but not limited to, disposal sites.

"Hazardous Material" means anything defined as a hazardous waste, hazardous substance, toxic substance, hazardous material, pollutant, or contaminant or similar term under an Environmental Law

None
☐

a. List the name and address of every site for which the debtor has received notice in writing by a governmental unit that it may be liable or potentially liable under or in violation of an Environmental Law. Indicate the governmental unit, the date of the notice, and, if known, the Environmental Law:

Case: 14-52449    Doc# 11    Filed: 06/19/14    Entered: 06/19/14 17:26:05    Page 20 of 25
Case: 14-52449    Doc# 97    Filed: 01/20/15    Entered: 01/20/15 10:52:41    Page 29 of 73

EXHIBIT A

| SITE NAME AND ADDRESS | NAME AND ADDRESS OF GOVERNMENTAL UNIT | DATE OF NOTICE | ENVIRONMENTAL LAW |
|---|---|---|---|
| **Silicon Valley Telecom Exchange, Inc**<br>**250 Stockton Avenue**<br>**San Jose, CA 95126** | **Santa Clara County**<br>**Dept of Environmental Health**<br>**1555 Berger Drive #300**<br>**San Jose, CA  95112-0000** | **2013** | **Diesel fuel spill** |

None
■    b. List the name and address of every site for which the debtor provided notice to a governmental unit of a release of Hazardous Material. Indicate the governmental unit to which the notice was sent and the date of the notice.

| SITE NAME AND ADDRESS | NAME AND ADDRESS OF GOVERNMENTAL UNIT | DATE OF NOTICE | ENVIRONMENTAL LAW |
|---|---|---|---|

None
■    c. List all judicial or administrative proceedings, including settlements or orders, under any Environmental Law with respect to which the debtor is or was a party. Indicate the name and address of the governmental unit that is or was a party to the proceeding, and the docket number.

| NAME AND ADDRESS OF GOVERNMENTAL UNIT | DOCKET NUMBER | STATUS OR DISPOSITION |
|---|---|---|

### 18 . Nature, location and name of business

None
■    a. *If the debtor is an individual*, list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was an officer, director, partner, or managing executive of a corporation, partner in a partnership, sole proprietor, or was self-employed in a trade, profession, or other activity either full- or part-time within **six years** immediately preceding the commencement of this case, or in which the debtor owned 5 percent or more of the voting or equity securities within **six years** immediately preceding the commencement of this case.

*If the debtor is a partnership*, list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was a partner or owned 5 percent or more of the voting or equity securities, within **six years** immediately preceding the commencement of this case.

*If the debtor is a corporation*, list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was a partner or owned 5 percent or more of the voting or equity securities within **six years** immediately preceding the commencement of this case.

| NAME | LAST FOUR DIGITS OF SOCIAL-SECURITY OR OTHER INDIVIDUAL TAXPAYER-I.D. NO. (ITIN)/ COMPLETE EIN | ADDRESS | NATURE OF BUSINESS | BEGINNING AND ENDING DATES |
|---|---|---|---|---|

None
■    b. Identify any business listed in response to subdivision a., above, that is "single asset real estate" as defined in 11 U.S.C. § 101.

| NAME | ADDRESS |
|---|---|

The following questions are to be completed by every debtor that is a corporation or partnership and by any individual debtor who is or has been, within **six years** immediately preceding the commencement of this case, any of the following: an officer, director, managing executive, or owner of more than 5 percent of the voting or equity securities of a corporation; a partner, other than a limited partner, of a partnership, a sole proprietor, or self-employed in a trade, profession, or other activity, either full- or part-time.

*(An individual or joint debtor should complete this portion of the statement **only** if the debtor is or has been in business, as defined above, within six years immediately preceding the commencement of this case. A debtor who has not been in business within those six years should go directly to the signature page.)*

### 19. Books, records and financial statements

None
☐    a. List all bookkeepers and accountants who within **two years** immediately preceding the filing of this bankruptcy case kept or supervised the keeping of books of account and records of the debtor.

**EXHIBIT A**

| NAME AND ADDRESS | DATES SERVICES RENDERED |
|---|---|
| **Orlando, Mitts, Moore & Company** | **2000 to present** |
| **675 N. First Street, Suite 1200** | |
| **San Jose, CA 95112** | |
| | |
| **Karen Rubio** | **2000 to present** |
| **308 Casitas Bulevar** | |
| **Los Gatos, CA 95032** | |

None ■    b. List all firms or individuals who within the **two years** immediately preceding the filing of this bankruptcy case have audited the books of account and records, or prepared a financial statement of the debtor.

| NAME | ADDRESS | DATES SERVICES RENDERED |
|---|---|---|

None ☐    c. List all firms or individuals who at the time of the commencement of this case were in possession of the books of account and records of the debtor. If any of the books of account and records are not available, explain.

| NAME | ADDRESS |
|---|---|
| **Silicon Valley Telecom Exchange, Inc.** | **250 Stockton Avenue** |
| | **San Jose, CA 95126** |
| | |
| **Orlando, Mitts, Moore & Company** | **675 N. First Street, Suite 1200** |
| | **San Jose, CA 95112** |

None ☐    d. List all financial institutions, creditors and other parties, including mercantile and trade agencies, to whom a financial statement was issued by the debtor within **two years** immediately preceding the commencement of this case.

| NAME AND ADDRESS | DATE ISSUED |
|---|---|
| **Campeau, Goodsell & Smith** | **07/2012, 10/2012, 01/2013, 04/2013, 07/2013,** |
| **Attn: Scott Goodsell** | **10/2013 & 04/2014** |
| **440 N. 1st Street, Suite 100** | |
| **San Jose, CA 95112** | |
| | |
| **Greenfield, Draa & Harrington** | **01/2014, 04/2014 (quarterly)** |
| **Attn: Maria Gerston** | |
| **55 S. Market #1500** | |
| **San Jose, CA 95113** | |
| | |
| **Law Office of Marc L. Pinckney** | **07/2012, 10/2012, 01/2013, 04/2013, 07/2013,** |
| **8677 Villa La Jolla Drive, Ste 230** | **10/2013 & 04/2014** |
| **La Jolla, CA 92037** | |

### 20. Inventories

None ■    a. List the dates of the last two inventories taken of your property, the name of the person who supervised the taking of each inventory, and the dollar amount and basis of each inventory.

| DATE OF INVENTORY | INVENTORY SUPERVISOR | DOLLAR AMOUNT OF INVENTORY (Specify cost, market or other basis) |
|---|---|---|

None ■    b. List the name and address of the person having possession of the records of each of the inventories reported in a., above.

| DATE OF INVENTORY | NAME AND ADDRESSES OF CUSTODIAN OF INVENTORY RECORDS |
|---|---|

### 21 . Current Partners, Officers, Directors and Shareholders

None ■    a. If the debtor is a partnership, list the nature and percentage of partnership interest of each member of the partnership.

| NAME AND ADDRESS | NATURE OF INTEREST | PERCENTAGE OF INTEREST |
|---|---|---|



**EXHIBIT A**

None    b. If the debtor is a corporation, list all officers and directors of the corporation, and each stockholder who directly or indirectly owns,
☐    controls, or holds 5 percent or more of the voting or equity securities of the corporation.

| NAME AND ADDRESS | TITLE | NATURE AND PERCENTAGE OF STOCK OWNERSHIP |
|---|---|---|
| **Fred Rubio, Jr.**<br>**308 Casitas Bulevar**<br>**Los Gatos, CA 95032** | **Managing Member** | **50%** |
| **Karen Rubio**<br>**308 Casitas Bulevar**<br>**Los Gatos, CA 95032** | **Member** | **50%** |

---

**22 . Former partners, officers, directors and shareholders**

None
■    a. If the debtor is a partnership, list each member who withdrew from the partnership within **one year** immediately preceding the
commencement of this case.

| NAME | ADDRESS | DATE OF WITHDRAWAL |
|---|---|---|

None
■    b. If the debtor is a corporation, list all officers, or directors whose relationship with the corporation terminated within **one year**
immediately preceding the commencement of this case.

| NAME AND ADDRESS | TITLE | DATE OF TERMINATION |
|---|---|---|

---

**23 . Withdrawals from a partnership or distributions by a corporation**

None
■    If the debtor is a partnership or corporation, list all withdrawals or distributions credited or given to an insider, including compensation
in any form, bonuses, loans, stock redemptions, options exercised and any other perquisite during **one year** immediately preceding the
commencement of this case.

| NAME & ADDRESS OF RECIPIENT, RELATIONSHIP TO DEBTOR | DATE AND PURPOSE OF WITHDRAWAL | AMOUNT OF MONEY OR DESCRIPTION AND VALUE OF PROPERTY |
|---|---|---|

---

**24. Tax Consolidation Group.**

None
■    If the debtor is a corporation, list the name and federal taxpayer identification number of the parent corporation of any consolidated
group for tax purposes of which the debtor has been a member at any time within **six years** immediately preceding the commencement
of the case.

| NAME OF PARENT CORPORATION | TAXPAYER IDENTIFICATION NUMBER (EIN) |
|---|---|

---

**25. Pension Funds.**

None
■    If the debtor is not an individual, list the name and federal taxpayer-identification number of any pension fund to which the debtor, as an
employer, has been responsible for contributing at any time within **six years** immediately preceding the commencement of the case.

| NAME OF PENSION FUND | TAXPAYER IDENTIFICATION NUMBER (EIN) |
|---|---|

* * * * * *

**DECLARATION UNDER PENALTY OF PERJURY ON BEHALF OF CORPORATION OR PARTNERSHIP**

**EXHIBIT A**

I declare under penalty of perjury that I have read the answers contained in the foregoing statement of financial affairs and any attachments thereto and that they are true and correct to the best of my knowledge, information and belief.

Date   **June 18, 2014**             Signature   **/s/ Fred D. Rubio**

                                                              **Fred D. Rubio**

                                                              **Managing Member**

[An individual signing on behalf of a partnership or corporation must indicate position or relationship to debtor.]

*Penalty for making a false statement: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571*

Case: 14-52449     Doc# 11     Filed: 06/19/14     Entered: 06/19/14 17:26:05     Page 24 of 25

Case: 14-52449     Doc# 97     Filed: 01/20/15     Entered: 01/20/15 10:52:41     Page 33 of 73

**EXHIBIT A**

# United States Bankruptcy Court
## Central District of California

In re    **Silicon Valley Telecom Exchange, LLC**        ,    Case No.    __14-52449__

                    Debtor

Chapter                **11**

# LIST OF EQUITY SECURITY HOLDERS

Following is the list of the Debtor's equity security holders which is prepared in accordance with Rule 1007(a)(3) for filing in this chapter 11 case.

| Name and last known address or place of business of holder | Security Class | Number of Securities | Kind of Interest |
|---|---|---|---|
| **Fred D. Rubio**<br>**308 Casitas Bulevar**<br>**Los Gatos, CA 95032** | **Member** | **50% Ownership interest** | **LLC Membership** |
| **Karen Rubio**<br>**308 Casitas Bulevar**<br>**Los Gatos, CA 95032** | **Member** | **50% Ownership Interest** | **LLC  Membership** |

## DECLARATION UNDER PENALTY OF PERJURY ON BEHALF OF CORPORATION OR PARTNERSHIP

        I, the Managing Member of the corporation named as the debtor in this case, declare under penalty of perjury that I have read the foregoing List of Equity Security Holders and that it is true and correct to the best of my information and belief.

Date    __June 18, 2014__               Signature __/s/ Fred D. Rubio__

                                                     **Fred D. Rubio**
                                                     **Managing Member**

*Penalty for making a false statement or concealing property*:   Fine of up to $500,000 or imprisonment for up to 5 years or both. 18 U.S.C §§  152 and 3571.

<u>**0**</u> continuation sheets attached to List of Equity Security Holders

Case: 14-52449   Doc# 11   Filed: 06/19/14   Entered: 06/19/14 17:26:05   Page 25 of 25

Case: 14-52449   Doc# 97   Filed: 01/20/15   Entered: 01/20/15 10:52:41   Page 34 of 73

EXHIBIT A



42 cooler units

3 generators

Load Bank

Fuel Tanks

1 generator

**EXHIBIT B**

EXHIBIT C

```
 1   CAMPEAU GOODSELL SMITH
     A Law Corporation
 2   SCOTT L. GOODSELL, SBN 122223
     440 N. First Street, Suite 100
 3   San Jose, California 95112
     (408) 295-9555
 4
 5   Attorneys for Creditor Campeau Goodsell Smith

 6

 7                      UNITED STATES BANKRUPTCY COURT

 8                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

 9
10   In re:                        )   Case No. 14-52449
                                   )
11   SILICON VALLEY TELECOM        )   CHAPTER 11
        EXCHANGE, LLC,             )
12                                 )   Date:  August 5, 2014
                        Debtor.    )   Time:     2:00 p.m.
13   _____)   Court: Hon. Charles Novack
                                       280 S. First Street Court #3070
14                                     San Jose, CA  95113
15
16          DECLARATION OF SCOTT L. GOODSELL IN SUPPORT OF
               CGS MOTION TO APPOINT CHAPTER 11 TRUSTEE
17
          I, Scott L. Goodsell, say:
18
          1.    I am a principal with the law firm of Campeau Goodsell Smith ("CGS").  I
19
     make this declaration in support of the said law firm's motion to appoint Chapter 11 trustee.  If
20
     called as a witness, I would competently testify as follows:
21
          2.    On July 2, 2014, I attended the sec. 341 Meeting of Creditors in the instant
22
     case.  While there is no written transcript at present, I noted the following matters from testimony
23
     given by Fred Rubio, responsible party for Debtor SVTX:
24
          a.    Per Rubio, SVTX holds a master lease from San Jose Unified School District
25
     ("SJUSD") on a 97,000 sf warehouse property at 250 Stockton Avenue in San Jose.  This lease
26
     was signed in/about 1999 and continues through 2024; the monthly rental due is $54,000.
27
```

b.      Per Rubio, after leasing the property, SVTX (and several prior tenants) made several million dollars of improvements to convert the warehouse property to a data center operation. SVTX entered into substantial long-term leases with Enron, Verio and NTTA. In 2000, Rubios also formed Silicon Valley Telecom & Internet Exchange LLC ("SVTIX") and SVTX orally leased a small utility space to SVTIX for a "meet me" room.

c.      Per Rubio, in 2001 when SVTX and SVTIX filed their first Chapter 11 petitions, Enron plus Verio plus NTTA occupied about 47,000 sf of the ground floor of the subject property, with SVTIX occupying about 2000 sf of the basement floor of the property. In 2002, Enron rejected its lease through its own Chapter 11 proceeding. In 2012, Verio and NTTA terminated their leaseholds.

d.      Per Rubio, SVTX's only current tenants are Rubio-owned SVTIX and Rubio-owned RAIX, who together occupy about 10,000 sf of the 97,000 facility – ergo, the subject property is about 90% vacant, and has been so vacant since Verio and NTTA left in 2012.

e.      Per Rubio, in 2011 Rubios formed RAIX LLC ("RAIX") and leased a small utility space to RAIX for $15,000/mo. Per Rubio, RAIX was capitalized with $20,000 of personal monies, plus personal credit cards that are repaid. Per Rubio, RAIX has sub-sub-sub-leased to multiple individual tenants and derives rents therefrom. Per RAIX has paid Rubios at least $90,000 in compensation since 2011. Per Rubio, because RAIX did not exist until after confirmation of the confirmed Plan, RAIX is not bound by said Plan, and any compensation paid by RAIX to Rubios is not subject to the absolute cap of $15,000/mo imposed by the confirmed Plan. Additionally, per Rubio, RAIX is not obligated to disclose its financial transactions, revenues or expenses as the confirmed Plan requires of SVTX and SVTIX on a quarterly basis.

3.      Per my review of Debtor's Schedules, SVTIX and RAIX together owe $198,930 to SVTX, which remains unpaid; this sum equates to about 4 months delinquent rent.

EXHIBIT C

However, per SVTX financial statements reviewed by me, during the 4th quarter of 2013, SVTIX and RAX together paid $307,573 in rent monies (substantially more than the $180,000 due under their combined leases), and during the 1st quarter of 2014, SVTIX and RAX together paid $284,781 (again substantially more than the $180,000 due under their combined leases).

4.      As set forth above, SVTX holds a master lease from SJUSD for the subject property, with monthly rental of $54,000/mo. This lease is crucial to SVTX existence, and therefore crucial to the confirmed Plan, and it is the only payment source for SVTX creditors.  In October 2013, SJUSD filed an unlawful detainer action to dispossess SVTX from the subject property; SJUSD alleged that SVTX had failed to pay rent since June 2013.  SVTX did not advise creditors that SVTX had failed to pay rent, nor did SVTX advise creditors that SJUSD had commenced an unlawful detainer action.

5.      Debtor SVTX, and former debtors SVTIX and Rubio & Associates, concurrently filed Chapter 11 petitions in October 2001 and a combined joint reorganization plan was confirmed in August 2007.  Generally, the confirmed Plan provides that SVTX (and SVTIX and Rubio & Associates) would make quarterly payments to SVTX creditors until they were paid in full with interest.  These payments were to derive from "80% of the net proceeds of Debtor's operations" – "[t]he purpose behind the 80%/20% split in the Plan was to ensure that creditors would be paid, while at the same time setting aside some funds for the Debtor to use for improvements or repairs." (Memorandum Decision, p. 7).  Debtor SVTX did not make the required Plan payments and CGS (with other creditors) filed a motion to compel payments in October 2009, which resulted in a Memorandum Decision Following Evidentiary Hearing filed March 4, 2013 in case no. 01-55137 (Bkcy.N.D.Cal.), a copy of which is attached hereto as Exhibit A.

1    6.    When I asked him at the July 2nd meeting of creditors if accountants had

2    reviewed and approved all payments to creditors since March 2013, Fred Rubio stated that he did

3    not know if SVTX accountants had done so.  I have subsequently called SVTX CPA Laurie

4    Orlando, but have received no response from her as of filing of this declaration.

5    I declare under penalty of perjury that the foregoing is true and correct and that this

6    declaration was executed at San Jose, California, on July 8, 2014.

7

. 8

9                                              /s/ Scott L. Goodsell

10                                         Scott L. Goodsell

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

**EXHIBIT C**

# Exhibit A

Case: 14-52449   Doc# 18-1   Filed: 07/08/14   Entered: 07/08/14 13:27:16   Page 5 of
38
Case: 14-52449   Doc# 97   Filed: 01/20/15   Entered: 01/20/15 10:52:41   Page 40 of
73

**EXHIBIT C**

FILED

MAR 04 2013

United States Bankruptcy Court
San Jose, California

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

In re                              ]   Case No. 01-55137-ASW
                                   ]
                                   ]
SILICON VALLEY TELECOM             ]
EXCHANGE, LLC,                     ]   Chapter 11
                                   ]
                Debtor.            ]
                                   ]
_____]

**MEMORANDUM DECISION FOLLOWING EVIDENTIARY HEARING**

This matter comes before the Court on a motion to compel Debtor to make plan payments, to appoint a receiver, or to convert the case to Chapter 7. Debtor Silicon Valley Telecom Exchange, LLC (hereafter, "Debtor") is represented by attorney Marc Pinckney. Movant Campeau Goodsell Smith (hereafter, "CGS") -- which represented Debtor in the bankruptcy case through confirmation of the Chapter 11 Plan -- is represented by attorney Gregory Charles. Movant Law Offices of David Tilem (hereafter, "Tilem") is represented by attorneys Bernard Greenfield and Marcia Gerston.

At the heart of this dispute, the parties disagree about the proper method for calculating payments due under the confirmed Plan. This Court has been asked to determine several related issues, including: (1) whether Debtor has complied with the terms

**EXHIBIT C**

1  of Debtor's confirmed Chapter 11 Plan concerning payments to

2  general unsecured creditors; (2) whether Debtor has complied with

3  the terms of this Court's July 23, 2010 Order (hereafter, "the July

4  23, 2010 Order") on the parties' stipulation which clarifies

5  Debtor's Plan payment obligations with regard to the general

6  unsecured creditors; and (3) if Debtor has failed to comply with

7  either the Plan or the July 23, 2010 Order, whether the Court

8  should then convert the case to Chapter 7 or appoint a receiver to

9  manage Debtor's business operations.  Movants have also asked the

10  Court to determine the appropriate method for calculating payments

11  due to the general unsecured creditors under the Plan.

12      The Court held an evidentiary hearing.[1]  After the hearing,

13  the parties submitted written briefs in the nature of closing

14  argument.  The Court has considered the evidence admitted at the

15  hearing, the written and oral arguments of counsel, and matters of

16  which this Court may take judicial notice.  For the following

17  reasons, the Court finds that some relief is appropriate and will

18  compel Debtor to make Plan payments, but the Court will not order

19  appointment of a receiver nor convert the case to Chapter 7, as

20  requested by CGS and Tilem.

21

22  I. Findings of Fact

23      A. The Confirmed Plan

24      Debtor commenced this bankruptcy case under Chapter 11 on

25  October 22, 2001.  However, a Chapter 11 plan was not confirmed

26  until almost six years later.  On August 24, 2007, after a hearing,

27  _____

28      [1] The evidentiary hearing occurred on several dates and was
    interrupted at the request of the parties so that they could engage
    in settlement negotiations.

Case: 01-55137   Doc# 1159   Filed: 03/04/13   Entered: 03/04/13 16:07:47   Page 2 of
19                                        2
Case: 14-52449   Doc# 18-1   Filed: 07/08/14   Entered: 07/08/14 13:27:16   Page 7 of
38
Case: 14-52449   Doc# 97   Filed: 01/20/15   Entered: 01/20/15 10:52:41   Page 42 of
73

**EXHIBIT C**

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  the Court confirmed Debtor's Third Amended Joint Plan of

2  Reorganization ("the Plan"). The Plan was a joint plan for three

3  separate debtors: Rubio & Associates, Inc.; Silicon Valley Telecom

4  & Internet Exchange, LLC ("SVTIX"); and Debtor Silicon Valley

5  Telecom Exchange, LLC ("SVTX"). However, the Plan was confirmed

6  only as to SVTX. Transcript ("Tr.") 179:21-25; 180:1-5.

7      The Court confirmed the Plan over objections from Tilem, as

8  assignee of the claim of creditor Corporate Builders, Inc.

9  (hereafter, "CBI"). The Court overruled Tilem's objections as

10 untimely. The Plan's effective date was sometime in September

11 2007.[2]

12

13      **Plan Execution**

14      The Plan identifies the following means for the Plan's

15 execution:

16              The funds necessary to implement the Plan
                will be derived from Debtor's post-Petition
17              business operations and/or from monies on hand.

18              Debtor's Business Operations. The
                payments to be made to creditors under the Plan
19              will be drawn from the proceeds of Debtor's
                operations. Debtor's expected operating
20              results are set forth in Exhibit A to the
                Disclosure Statement, which is a pro forma
21              income statement for the five year period of
                the Plan payments and which shows Debtor's
22              anticipated financial condition from the
                Effective Date of the Plan. The projections
23              anticipate that cash flow from operations after
                the Effective Date will be sufficient to meet
24              Debtor's operating obligations and Plan
                obligations on an on-going basis. Debtor
25              anticipates an increase in rents from lease of
                additional space available to SVTX as a result
26              of Enron's termination of its leasehold

27  ─────────────────

28          [2] In questioning Mr. Rubio, Mr. Charles stated that the Plan
    was effective on September 20, 2007. Tr. 83:21-25.

**EXHIBIT C**

1            interest, and Debtor anticipates an increase in
           rents from lease of space available to SVTIX.

2 Plan at ¶ IX. The Plan also specifies when payments to creditors

3 are due, as follows:

4

5            <u>Quarterly Payment Dates</u>. The Plan
           provides for quarterly payments to claimants.
6            Quarterly payments will be made within ten (10)
           days after January 1, April 1, June 1, and
7            October 1 ("Quarterly Payment Date") of each
           calendar year after the Confirmation Date until
8            claimants are paid in full as provided for by
           this Plan. The first quarterly payment will be
9            made the first Quarterly Payment Date that
           occurs 90 days after the Confirmation Date.

10 <u>Id.</u>

11     If Debtor fails to make payments as required by the Plan, the

12 Plan provides what will occur in the event of a default:

13            <u>Default</u>. In the event that the
           Reorganized Debtor defaults in the performance
14            of its obligations under this Plan, and shall
           not have cured such default within a period of
15            ten (10) days after receipt of written notice
           of default from the holder of any allowed
16            claim, then the holder of such allowed claim
           may pursue such remedies as are permitted by
17            law. . . . If there is a material default under
           the terms of the plan and upon a successful
18            post-confirmation motion to convert this case
           to a case under Chapter 7 of title 11, this
19            plan shall terminate, and the Chapter 7 estate
           shall consist of all remaining property not
20            already administered.

21 <u>Id.</u>

22     Under the Plan, the Court has retained jurisdiction to resolve

23 any dispute regarding the interpretation of the Plan, to enforce

24 and implement the Plan, to enter orders "in aid of consummation" of

25 the Plan, and to modify the Plan under 11 U.S.C. § 1127, among

26 other things not applicable to the instant motion. <u>Id.</u> at ¶ X.

27

28

**EXHIBIT C**

1     **<u>Required Payments Under Plan</u>**

2     The Plan requires Debtor to pay all allowed general unsecured

3 claims[3] from multiple sources. These unsecured creditors are to

4 share, on a <u>pro rata</u> basis, in the following: an Effective Date

5 Payment of $50,000.00; distributions from Enron's Chapter 11

6 bankruptcy case,[4] including an amount of $192,302.74 already

7 collected; and any preference recoveries. Significant to the

8 instant matter, each creditor is also entitled to quarterly

9 payments consisting of a "<u>pro rata</u> distribution of 80% of the net

10 proceeds of Debtor's on-going operations, which payments shall

11 continue until claimant is paid in full for the principal amount of

12 its claim plus interest accruing at the Federal Rate." Plan at ¶¶

13 VI.D through VI.L.[5]

14     Debtor, CGS, and Tilem disagree as to the meaning of "net

15 proceeds." In his testimony, Scott Goodsell[6] agreed that the term

16 _____

17    [3] The Plan and Disclosure Statement identify the following

18 holders of general unsecured claims: CB Richard Ellis, Granite Capital/Telegis, CBI, Verio, Inc., Fernando (aka Fred) and Karen Rubio, Michael Oaks, and NTT America. Debtor's Addendum to the

19 Disclosure Statement filed August 17, 2007, identifies the amounts owed to each of the unsecured creditors, as follows: CB Richard

20 Ellis ($65,435.09), Granite Capital ($102,245.52), CBI ($500,000.00), Verio, Inc. ($180,389.70), Fred and Karen Rubio

21 ($0.00), Michael Oaks ($30,000.00), and NTT America ($30,000.00).

22    [4] Enron's involvement is discussed more fully <u>infra</u>.

23    [5] By contrast, the Addendum to the Disclosure Statement stated

24 that the source of the payments will be "80% of the net profit of Plan Proponents' business operations (the remaining 20% of net

25 profits will be held in a reserve account for payment of unanticipated expenses)." Addendum at p. 3, lines 4-8.

26    [6] In addition to being an attorney with CGS, Mr. Goodsell is

27 also a Certified Internal Auditor. Tr. 146:18-21. Mr. Goodsell described this certification as being equivalent to a Certified

28 Public Accountant. Tr. 146:19-25. However, CGS's attorney

                                           (continued...)

Case: 01-55137   Doc# 1159   Filed: 03/04/13   Entered: 03/04/13 16:07:47   Page 5 of
19     5

Case: 14-52449   Doc# 18-1   Filed: 07/08/14   Entered: 07/08/14 13:27:16   Page 10
of 38

Case: 14-52449   Doc# 97   Filed: 01/20/15   Entered: 01/20/15 10:52:41   Page 45 of
73

**EXHIBIT C**

1  "net proceeds from ongoing business operations" was a term drafted

2  by Mr. Goodsell, and that the Plan does not define "net proceeds."

3  Tr. 293:13-25.  Prior to confirmation, Mr. Pinckney (then of CGS)

4  agreed in open court at the hearing held August 24, 2007, that

5  "profits" would mean "proceeds" under the Plan, but no such

6  definition was ever incorporated.

7       It was CGS's attorneys who drafted the Plan and Disclosure

8  Statement in this case.  Tr. 186:22-25; Tr. 187:1-3.  One of the

9  primary authors of the Plan was Debtor's attorney, Scott Goodsell

10 of CGS.  Tr. 153:7-9.  However, according to Mr. Goodsell, the

11 Third Amended Plan was drafted by attorney Marc Pinckney, who at

12 the time worked for CGS.  Tr. 293:9-12.[7]

13      Complicating the absence of a definition is the fact that "net

14 proceeds" is not an accounting term.  Debtor's accountant, Laurie

15 Orlando -- who testified that she has not seen the Plan -- stated

16 that "net proceeds" is not an accounting term and therefore would

17 need to be defined.  Tr. 364:3-4; Tr. 366:1-3.[8]  The absence of a

18 clear definition of "net proceeds" was raised by Tilem in his

19

20      [6](...continued)
   declined to offer Mr. Goodsell as an accounting expert, after
21  counsel for Debtor objected.  Tr. 175:7-17.

22      [7] With regard to the main bankruptcy case, attorneys at CGS
   continued to represent Debtor through confirmation of the Plan
23 until at least September 2007.  Mr. Pinckney advised that CGS
   continued to represent Debtor in 2008 in Adversary Proceeding No.
24 08-5001.  However, it was Mr. Pinckney -- not Mr. Goodsell -- who
   filed the interpleader complaint on January 2, 2008.  At the time,
25 Mr. Pinckney still worked for CGS.

26      [8] By contrast, Ms. Orlando testified that "net profit" is an
   accounting term, but did not define the term.  Tr. 378:20-22; Tr.
27 379:14.  Ms. Orlando also testified that the term "net income" is
   different from "net profit."  Tr. 382:7-8 and 18-24; Tr. 383:16-21;
28 Tr. 384:5-10 and 22-25.

EXHIBIT C

EXHIBIT C

1 objection to confirmation, but because the objection was untimely,
2 the issue has not been addressed until now.
3     Even without a clear definition, the parties' attributed
4 similar, but not identical, meanings to the term "net proceeds."
5 Fred Rubio, II,[9] the principal, owner, and manager of Debtor,
6 testified that the Plan required Mr. Rubio "to pay on a quarterly
7 basis . . . the creditors, after looking at a cash basis, 80
8 percent of the net proceeds" and that "20 percent basically goes to
9 a reserve account."  Tr. 25:11-14; Tr. 51:8-21.  Mr. Rubio also
10 testified that he had discussions with his accountants, Ms. Orlando
11 and Victoria Martini, to determine what the term "net proceeds"
12 means.  Tr. 26:24-25 and 49:1.  Mr. Rubio understood that "net
13 proceeds" were the "net profits after all expenses are paid" for a
14 particular time period -- or "income minus expenses."  Tr. 116:8-
15 13.  Mr. Goodsell agreed with Mr. Rubio's definition, and added
16 that regular operating expenses should be subtracted from gross
17 proceeds to obtain net proceeds.  Tr. 160:13-17; Tr. 222:5-11.
18 According to Mr. Goodsell, operating expenses would not include
19 major renovations, improvements, or repairs.  Tr. 163:16-12; Tr.
20 300:15-23; Tr. 465:23-25; Tr. 466:1.
21     The purpose behind the 80%/20% split in the Plan was to ensure
22 that creditors would be paid, while at the same time setting aside
23 some funds for the Debtor to use for improvements or repairs.  Tr.
24 153:22-25; Tr. 154:1-4; Tr. 163:16-20.  Debtor's Disclosure
25 Statement,[10] including the Addendum thereto, explained that the

26
27     [9] Mr. Rubio's actual name is Fernando Rubio, Jr., but he uses
the name Fred.  Tr. 527:20-21; Tr. 528:18.
28     [10] The Disclosure Statement (or "DS") was entitled "[Third
(continued...)

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1    remaining 20% would be "held by Debtor as a reserve to pay for

2    unanticipated but necessary building repairs or other expenses

3    necessary for the preservation of Debtor's operations[.]"  DS at p.

4    12, lines 9-12.  Attached to the Disclosure Statement was a Cash

5    Flow Analysis projecting quarterly payments ranging from $70,363.00

6    to $667,219.05 to the general unsecured creditors from the second

7    quarter of 2003 through the first quarter of 2008.  The Cash Flow

8    Analysis did not project any major repairs or improvements.  Mr.

9    Rubio agreed that Debtor projected no capital expenses between

10   April 1, 2006 and March 31, 2011, in evaluating Debtor's present

11   value for purposes of the Disclosure Statement.  Tr. 73:9-25; Tr.

12   74:1-13.

13       At the hearing, Mr. Goodsell testified that he did not believe

14   that Debtor could make principal and interest payments to San Jose

15   National Bank as part of Debtor's operations, and that payments

16   toward principal could not be deducted before calculating net

17   proceeds.  Tr. 438:7-16.  Mr. Goodsell believed that the meaning of

18   "net proceeds" later changed such that the principal payments could

19   not be deducted.  Tr. 445:1-12; Tr. 446:1-2; Tr. 447:25 to 448:9.

20   The Court finds such testimony to be disingenuous, at best, because

21   it is contradicted by the Plan, drafted by attorneys at CGS, which

22   requires Debtor to pay the principal obligation.  The testimony is

23   also contradicted by the Cash Flow Analysis submitted with the

24   Disclosure Statement.  The Cash Flow Analysis shows that Debtor

25   anticipated the entire payment to San Jose National Bank -- along

26   with other amounts paid, such as rent, insurance, taxes, utilities,

27

28   [10](...continued)
     Amended] Disclosure Statement on Joint Plan of Reorganization."

EXHIBIT C

1  landscaping, payroll, and similar expenses -- would be excluded

2  before calculating the 80% amount payable to creditors. This

3  treatment of the payment to San Jose National Bank, including the

4  principal reduction payments, was fully disclosed to all creditors

5  prior to confirmation. Regardless, the propriety of the payment to

6  San Jose National Bank is not the central issue before this Court.

7  Apart from the complaints made by CGS, there have been no other

8  objections to these payments.

9

10  **B. Debtor's Business**

11  Rubio and Associates, a business operated by Fred Rubio, II,

12  leased a warehouse located at 250 Stockton Street, San Jose,

13  California ("the Property"), from the San Jose Unified School

14  District starting in 1999. Tr. 123:8-13; Tr. 255:2-6. In 1999,

15  Mr. Rubio formed Debtor and became Debtor's managing member. Tr.

16  528:5-7 and 16-18; Tr. 529:9. Debtor took over the master lease[11]

17  of the Property for purposes of operating a co-location facility on

18  the premises. Tr. 180:7-12. According to Mr. Rubio, a co-location

19  facility is a data center where different companies place their

20  computer servers and sometimes outsource maintenance and

21  management. Tr. 532:17-23. Debtor leased parts of the facility to

22  various tenants, including Enron, Verio, and NTTA. Tr. 180:13-15.

23  The master lease will expire in April or May 2019, but has a five-

24  year option to renew. Tr. 598:22-24.

25  In 2000, Mr. Rubio formed SVTIX and became SVTIX's managing

26  member. Tr. 528:24-25; 529:1 and 10-12. The purpose of SVTIX was

27  _____

28  [11] At the hearing on November 22, 2011, Mr. Goodsell testified
that the master lease "probably has about 10 years to run." Tr.
255:7-9.

**EXHIBIT C**

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  to oversee the "meet me room," a large utility room where the

2  carriers (such as AT&T, Verizon, and others) reside.  Tr. 531:11-

3  23; Tr. 534:7-11.  SVTIX rents space on the first floor of the

4  Property, colloquially referred to as "the basement."  Tr. 181:3-

5  11.

6      Mr. Rubio manages and operates Debtor's and SVTIX's business

7  on the Property.  Tr. 123:14-25; Tr. 124:5-19; Tr. 529:2-6.  Mr.

8  Rubio testified that Mr. Rubio was in charge of Debtor's day-to-day

9  finances until the accountants took over that responsibility in

10 September 2009.  Tr. 59:20-22; Tr. 117:1-8.  Mr. Rubio works in

11 real estate, and is neither an engineer nor an accountant.  Tr.

12 120:25 to 121:6-12.

13     It is Mr. Rubio's wife, Karen Rubio, who keeps Debtor's books,

14 receives the rent and other income, writes and records checks, and

15 calculates the quarterly Plan distributions.  Tr. 529:18-25; Tr.

16 530:1-14.  To accomplish these tasks, Ms. Rubio uses QuickBooks

17 Pro, on which she has received some training.  Tr. 602:11-19.

18 However, Ms. Rubio is not an accountant and does not know

19 definitions for all accounting terms, such as "amortization."  Tr.

20 603:11-12; Tr. 615:24-25.  Ms. Rubio recalled "glancing" at the

21 Plan, but confessed that she has not read the Plan in depth and has

22 not reviewed the amended Disclosure Statement.  Tr. 617:7-14.  Ms.

23 Rubio testifed that in deciding how much money to pay to CGS under

24 the Plan, Ms. Rubio had no instruction; instead, Ms. Rubio simply

25 took the cash balance for the companies and subtracted "imminent

26 expenses."  Tr. 623:10-17.

27     Debtor pays a total salary to Mr. and Ms. Rubio of $15,000 per

28 month.  Tr. 258:21-25; Tr. 259:1-2.  Debtor has also paid other

EXHIBIT C

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1   members of the Rubio family for work performed at the Property.

2   According to Mr. Rubio, Starting in 2010, two of Mr. and Ms.

3   Rubio's three sons -- Fred, Ryan, and Eric -- worked for the Debtor

4   as Building Operating Center Technicians. Tr. 75:19-24; Tr. 76:23-

5   25; Tr. 77:5-9. In that role, the sons performed "reboots" and

6   "KVM," swapped hard drives, took down firewalls, and traced network

7   cables. Tr. 76:1-3. At one point or another, all three of Mr.

8   Rubio's sons worked for Debtor. Tr. 121:22 to 122:6. Mr. Rubio

9   set his sons' rates of pay. Tr. 76:14-15. Some of the sons' high

10   school friends also worked for Debtor performing landscaping and

11   painting work. Tr. 77:16-20; Tr. 122:10-13. According to Mr.

12   Goodsell and Mr. Rubio, Debtor also pays a woman named Jackie

13   Fitzpatrick a fixed monthly commission to bring in new clients.[12]

14   Tr. 127:14-25; Tr. 128:1-2; Tr. 259:12-16; Tr. 260:1-2. In 2008,

15   the commission was $10,000.00 per month. Tr. 127:25; Tr. 128:1.

16      In 2001, one of the tenants at the Property -- Enron -- filed

17   for Chapter 11 bankruptcy and rejected Enron's lease with Debtor.

18   Tr. 181:17-22; Tr. 534:14-20. Enron vacated the Property and

19   abandoned approximately $20 million in equipment, all of which was

20   built into the Property. Tr. 534:17-20; Tr. 536:24-25; Tr. 537:1;

21   Tr. 537:6-11. After Enron departed, SVTIX assumed responsibility

22   for the operation of the Enron equipment. Tr. 540:6-9. SVTIX was

23   unable to lease the entire space vacated by Enron, but was able to

24   lease "lots and lots and lots of cabinets." Tr. 538:6-14. To the

25   new tenants, SVTIX provided maintenance and management of the

---

27   [12] It was not clear from the testimony when Ms. Fitzpatrick

28   began to work for Debtor. The commission paid to Ms. Fitzpatrick
  was not listed on the Cash Flow Analysis submitted with the
  Disclosure Statement prior to confirmation.

Case: 01-55137   Doc# 1159   Filed: 03/04/13   Entered: 03/04/13 16:07:47   Page 11
of 19
Case: 14-52449   Doc# 18-1   Filed: 07/08/14   Entered: 07/08/14 13:27:16   Page 16
of 38
Case: 14-52449   Doc# 97   Filed: 01/20/15   Entered: 01/20/15 10:52:41   Page 51 of
73

EXHIBIT C

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  tenants' equipment, such as rebooting computers and performing an

2  operation called "keyboard, video, and mouse" (KVM), which allows

3  customers from around the world to monitor the customers' equipment

4  from remote locations.  Tr. 540:15-24; Tr. 541:7-19.

5      Mr. Rubio testified that Debtor made leasehold improvements at

6  the Property in 2007.  The improvements included building out the

7  cabinets and racks, adding electrical infrastructure to some of the

8  Enron rooms, bolting down the cabinets and ladder racking, and

9  building up the data centers.  Tr. 63:14-23.

10      According to Mr. Rubio, Debtor spent between $47,000 and

11  $48,000 on cost of goods sold in 2007.  Tr. 65:10-12.  Mr. Rubio

12  also testified that in 2008, 2009, and 2010, Debtor spent a bit

13  more than $23,000, $18,000, and $20,000, respectively, on cost of

14  goods sold.  Tr. 65:13-18.

15      Mr. Rubio also testified about the difference between

16  maintenance and repairs.  Tr. 66:10-15.  Mr. Rubio stated that

17  maintenance pertains to maintaining existing electrical

18  infrastructure, such as servicing the generators, the UPS,[13] and the

19  electrical systems.  Tr. 66:10-15.  By contrast, a repair involves

20  repairing an existing broken item, such as a broken pipe, a damaged

21  fence, leaking batteries, or air conditioning systems.  Tr. 66:10-

22  15.  Mr. Rubio further stated that repairs are not improvements.

23  Tr. 67:1-2.

24      According to Mr. Rubio, Debtor spent $41,822.95 on contractors

25  in 2007, $230,572.69 on contractors in 2008, $201,836.08 on

26

27      [13] UPS stands for "uninterrupted power supply."  Tr. 542:2-5.
Each UPS serves as a battery backup system which protects against

28  losses caused by power outages.  Tr. 128:22-24; Tr. 593:24-25; Tr.
594:1-3.

EXHIBIT C

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1 contractors in 2009, and $76,059.46 on contractors in the first
2 half of 2010.  Tr. 67:5 to 68:2; Tr. 70:11-19; Tr. 72:1-9.  Mr.
3 Rubio clarified that contractors were entities that were "building
4 things at the building."  Tr. 68:5-7.  Mr. Rubio stated that the
5 type of work performed by the contractors could be repairs,
6 maintenance, or "new installs."  Tr. 68:19-22.  Ms. Rubio verified
7 that contractor expenses included monthly service and maintenance
8 contracts.  Tr. 606:3-15.

9 Of the $41,822.95 spent on contractors in 2007, Mr. Rubio
10 testified than none was spent on new infrastructure, but instead
11 was used to expand the existing infrastructure in the Enron Data
12 Center.  Tr. 69:15-17; Tr. 70:11-24.  In 2008, Debtor spent
13 $230,572.69 on infrastructure improvements; Debtor bought a new UPS
14 system and installed rows of cabinets, cages, and ladder racking.
15 Tr. 69:18-19; Tr. 71:4-14; Tr. 72:1-3.  The UPS system purchased in
16 2008 -- which Debtor referred to as "UPS Charlie" -- was installed
17 in the summer of 2008 at a cost of $115,000.00.  Tr. 542:24-25; Tr.
18 543:1-4 and 16-18.  According to Mr. Rubio, once UPS Charlie was
19 installed, there were customers who needed to use it, and UPS
20 Charlie began to generate $33,000.00 per month.  Tr. 543:5-13.
21 Within a few months, UPS Charlie had paid for itself.

22 Between confirmation of the Plan and the end of 2008, Mr.
23 Rubio agreed that Debtor performed speculative improvements to the
24 building in the hope of attracting new tenants, which included a
25 new transformer at a cost of $38,000.00, with a $26,000.00
26 installation cost.  Tr. 128:16-21; Tr. 130:1-3.  Mr. Rubio also
27 agreed that Debtor replaced at least one UPS system at a cost of
28 $28,000.00, plus $15,000.00 in installation costs.  Tr. 128:22 to

Case: 01-55137   Doc# 1159   Filed: 03/04/13   Entered: 03/04/13 16:07:47   Page 13
of 19   13
Case: 14-52449   Doc# 18-1   Filed: 07/08/14   Entered: 07/08/14 13:27:16   Page 18
of 38
Case: 14-52449   Doc# 97   Filed: 01/20/15   Entered: 01/20/15 10:52:41   Page 53 of
73

EXHIBIT C

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  129:12.  Debtor also installed lighting ballasts outside because

2  NTTA complained that women were being accosted in the parking lot.

3  Tr. 129:13-21.  According to Ms. Rubio, Debtor also had security

4  expenses, which were the main item charged under the "consulting

5  expenses" category.  Tr. 604:12-14.  Ms. Rubio also explained that

6  the consulting category did not include expenses for construction

7  of improvements, such as the installation of UPS systems.  Tr.

8  604:21-25; Tr. 605:1-3.  Instead, any large equipment purchases --

9  such as the UPS systems or replacement transformers -- would be

10 charged as a fixed asset expense.  Tr. 606:20-25; Tr. 607:1-5.

11      In 2009, Debtor spent $201,836.08 on infrastructure

12 improvements on the air conditioning system, as well as on "walls

13 in the power room in the basement."  Tr. 69:20-23; Tr. 72:4-6.  In

14 the first half of 2010, Debtor spent $76,059.46 on infrastructure

15 improvements.  Tr. 72:7-9.  Mr. Rubio also testified that Debtor

16 purchased another UPS system -- "UPS David" -- in 2010 for

17 approximately $115,000.00 to $120,000.00.  Tr. 544:16-24; Tr.

18 545:2-3.  However, Mr. Rubio stated that only 16 to 17 percent of

19 UPS David was rented out to customers, because Mr. Goodsell told

20 Mr. Rubio to cease spending money on construction in May 2010 to

21 avoid violating the terms of the Plan.  Tr. 545:12-24; Tr. 547:25;

22 Tr. 548:1-6; Tr. 549:21-24; Tr. 550:17-23.

23      Mr. Rubio testified that without further construction, the

24 remainder of UPS David could not be leased to customers.  Tr.

25 551:5-14.  Mr. Rubio also stated that Debtor ceased purchasing

26 cabinets and power for UPS David, even though those costs would

27 have been reimbursed by any customers.  Tr. 553:18-25.  Debtor

28 purchased $22,000.00 in cabinets in April 2010, which allowed for a

**EXHIBIT C**

1  portion of UPS David to be leased.  Tr. 576:20-25.  Slightly more

2  than this amount was reimbursed through non-recurring charges to

3  the customers.  Tr. 577:12-15; Tr. 609:21-25.  Mr. Rubio believed

4  that if the construction had taken place, Debtor would have been

5  able to lease all of UPS David.  Tr. 554:20-22.  In other words,

6  Mr. Rubio believed that if Debtor had been allowed to build out UPS

7  David, the construction would have paid for itself.

8      Mr. Goodsell testified that two of Debtor's "big footprint

9  tenants" -- Verio and NTTA -- left the property in May 2010 and

10 were never replaced with other "big footprint tenants."  Tr. 243:1-

11 5; Tr. 244:7-12.  As a result, Debtor's revenues declined.  Tr.

12 243:1-5; Tr. 258:7-20.  According to Mr. Goodsell, the revenue

13 stream from Verio and NTTA[14] was sufficient -- in fact critical --

14 to fund the Plan, but when Verio and NTTA left the Property, it

15 became highly unlikely that creditors would be paid.  Tr. 243:7-19.

16     Mr. Rubio acknowledged that rents dropped significantly after

17 Verio and NTTA left the Property, and that Debtor needed to replace

18 these rents in order to remain solvent.  Tr. 556:20-24; Tr. 574:6-

19 8.  Verio had been paying monthly rent of $55,000.00, and NTTA had

20 been paying monthly rent of $35,000.00.  Tr. 557:6-21.  In

21 addition, both Verio and NTTA had paid a pro rata share of taxes,

22 insurance, and other expenses.  Tr. 557:6-21.  Mr. Rubio explained

23 that Debtor had been unable to attract tenants to the space left

24 vacant by Verio and NTTA because of soil contamination located near

25 diesel power generators, which was disclosed to Debtor in May 2010,

26 and which Verio agreed to remediate.  Tr. 558:4-15; Tr. 559:14-25;

27

28     [14] According to Mr. Goodsell, the revenue from Verio and NTTA
   was "probably 75 grand a month, maybe more[.]"  Tr. 258:11.

EXHIBIT C

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  Tr. 561:3-14.  Mr. Rubio testified that some remediation was

2  performed, but the Property is still not leasable because the San

3  Jose Fire Department and Santa Clara County Health Services have

4  not provided a closure letter stating that the Property is clean.

5  Tr. 562:4-7; Tr. 565:7-25.  Also, the diesel generators have not

6  been inspected, and Verio and NTTA have been unwilling to perform

7  any testing of the generators.  Tr. 566:20-25; Tr. 567:16-24.

8  According to Mr. Rubio, the soil contamination is the subject of a

9  lawsuit now pending in federal court.  Tr. 567:24-25.[15]

10      Both Debtor and SVTIX hired Ms. Orlando, a Certified Public

11  Accountant, to prepare tax returns for tax years 2007, 2008, and

12  2009.  Tr. 334:15-17; Tr. 335: 10-22.  To prepare the returns, Ms.

13  Orlando obtained balance sheets, income statements, and loan

14  documentation from Karen Rubio.  Tr. 336:6-11.  According to Ms.

15  Orlando, for tax year 2007, Debtor and SVTIX's combined income was

16  $2,155,465.00, but the cost of sales and direct expenses were

17  $1,315,785.00, after disregarding intercompany charges for rents

18  and utilities.  Tr. 355:5-7; Tr. 359:11-16.  Similarly, for tax

19  year 2008, Debtor and SVTIX's combined income was $2,530,079.00,

20  with cost of sales and direct expenses of $1,608,281.00.  Tr.

21  355:8-11; Tr. 359:17-18.  For tax year 2009, Debtor and SVTIX's

22  combined income was $3,330,676.00, with cost of sales and direct

23  expenses of $2,045,262.00.  Tr. 359:3-7 and 19-20.

24

25

26

27

28

---

[15] According to PACER, the district court case is Case No.
12-cv-00899-HRL, and remains pending.

16

**EXHIBIT C**

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

**C. Payments to Creditors**

CGS and Tilem are creditors.  Tilem is a creditor of claimant CBI and thus claims to be a general unsecured creditor.  By contrast, CGS is a creditor due to the attorney's fees owed by Debtor.

Approximately four months after the Plan was confirmed, on December 28, 2007, CGS filed an application with the Court seeking $1,238,814.68 for services performed and costs expended during the case.  If approved, this would have brought the total fees paid in the case to $1,819,701.20, and the total expenses to $45,260.59. On March 19, 2008, the Court issued an order authorizing interim compensation to CGS in the amount of $400,000.00, to be split between Debtor, SVTIX, and Rubio & Associates.  At a hearing held July 17, 2008, Debtor, CGS, and interested parties SVTIX and Rubio & Associates, agreed that the net fees and costs remaining to be paid by Debtor (SVTX) were $948,033.97 and $45,260.59, respectively.  Debtor, CGS, and the interested parties also agreed that the fees and costs to be paid for the interpleader proceeding were $4,000.00 and $313.00, respectively. As of November 22, 2011, Debtor continued to owe CGS approximately $410,000 in fees.  Tr. 253:23-25.  That amount continues to accrue interest at the Federal Rate, as specified by the Plan.  Tr. 254:1-4.

Mr. Rubio testified to his understanding that CGS is to be paid before any other creditor.  Tr. 134:14-25 and 135:1-10.  Mr. Goodsell confirmed that CGS's claim is to be paid "as an administrative claim" before any payment to unsecured creditors. Tr. 293:3-7.  The parties filed a Joint Pretrial Statement in which

1  the parties stipulated to the following facts concerning Debtor's

2  cash balances and amounts actually paid to CGS:

| Calendar Quarter Ending Date | Debtor's (SVTX) Balance Sheet Cash Balance | SVTIX Balance Sheet Cash Balance | Amount Paid to CGS |
|---|---|---|---|
| 12/2007 | $161,597.18 | $41,664.05 | $0.00 |
| 3/2008 | $40,017.90 | $85,072.39 | $87,268 on 2/15/08 |
| 6/2008 | $62,347.51 | $25,387.66 | $0.00 |
| 9/2008 | $82,255.87 | $43,429.54 | $0.00 |
| 12/2008 | ($48,433.90) | ($113,852.82) | $219,000 on 12/28/08 |
| 3/2009 | $98,195.83 | $45,296.57 | $0.00 |
| 6/2009 | $32,223.79 | $88,696.96 | $50,000 on 7/14/09 |
| 9/2009 | $96,770.48 | $13,476.00 | $19,500 on 10/30/09 |
| 12/2009 | $79,318.49 | ($46,324.24) | $198,159.06 on 12/29/09 and 12/30/09 |
| 3/2010 | $17,167.26 | $196,815.96 | $158,916.67 on 4/7/10 and 5/19/10 |
| 6/2010 | $596.14 | $15,996.43 | $13,274.05 on 7/8/10 |
| TOTAL PAID TO CGS | | | $746,117.78 |

19  It is Debtor's contention that calculation of the amount due

20  to creditors should be premised upon a "balance sheet cash

21  balance."[16]  By contrast, CGS and Tilem assert that the calculation

22  should be premised upon "reported SVTX cash basis profits."  The

23  parties' joint statement provides that the difference between these

24  two methods is that Debtor's calculation includes checks which have

25  been written but not yet presented to the bank for payment, while

26  ─────────────

27      [16] Mr. Rubio testified that he first heard the term "balance
28  sheet cash balance" in the later part of 2009 from accountants
    Victoria Martini and/or Laurie Orlando.  Tr. 115:16-19 and 116:1-2.

**EXHIBIT C**

1  CGS and Tilem do not factor unpresented checks into the

2  calculation.

3      Notwithstanding Debtor's assertion that the calculation of the

4  amount due should be based upon the balance sheet cash balance, the

5  above table shows that in most quarters, Debtor, together with

6  SVTIX, paid CGS less than 80% of the balance sheet cash balance.

7  However, there were quarters in which Debtor made a payment to CGS

8  despite a negative balance sheet cash balance -- for instance, the

9  quarters ending December 2008 and December 2009.

10     It is difficult to calculate the precise amount which Debtor

11  should have paid to CGS, but the parties' data allow for an

12  estimate.  Based upon the parties' stipulated figures, the Court

13  has calculated that if Debtor and SVTIX had segregated 80% of each

14  balance sheet cash balance for CGS, the following amounts could[17]

15  have been available to pay CGS:

| Calendar Quarter Ending Date | 80% of Debtor's (SVTX) Balance Sheet Cash Balance | 80% of SVTIX's Balance Sheet Cash Balance | Total Available for CGS |
|---|---|---|---|
| 12/2007 | $129,277.74 | $33,331.24 | $162,608.98 |
| 3/2008 | $32,014.32 | $68,057.91 | $100,072.23 |
| 6/2008 | $49,878.00 | $20,310.13 | $70,188.13 |
| 9/2008 | $65,804.70 | $34,743.63 | $100,548.33 |

23      [17] The Court qualifies this finding, because there were
quarters in which Debtor posted negative balance sheet cash
24  balances due to payments made to CGS during those quarters.

Case: 01-55137   Doc# 1159   Filed: 03/04/13   Entered: 03/04/13 16:07:47   Page 19
of 19
Case: 14-52449   Doc# 18-1   Filed: 07/08/14   Entered: 07/08/14 13:27:16   Page 24
of 38
Case: 14-52449   Doc# 97   Filed: 01/20/15   Entered: 01/20/15 10:52:41   Page 59 of
73

EXHIBIT C

| 12/2008 | NA[18] | NA[19] | NA |
|---|---|---|---|
| 3/2009 | $78,556.66 | $36,237.26 | $114,793.92 |
| 6/2009 | $25,779.03 | $70,957.57 | $96,736.60 |
| 9/2009 | $77,416.38 | $10,780.80 | $88,197.18 |
| 12/2009 | $63,454.79 | NA[20] | $63,454.79 |
| 3/2010 | $13,733.81 | $157,452.76 | $171,186.57 |
| 6/2010 | $476.91 | $12,797.14 | $13,274.05 |
| **Total** | | | **$981,060.78** |

The Court's calculation of the amount which might have been available to pay CGS is, necessarily, a rough one. However, if the Court were to adopt Debtor's position that the calculation of the amount due to CGS should be based upon the balance sheet cash balance, Debtor may have underpaid CGS by approximately $234,943.00 ($981,060.78 minus $746,117.78) between December 2007 and June 2010.

Mr. Goodsell testified that Debtor should have paid, but did not pay, the sum of $819,054.02 to CGS. Tr. 433:10-16. This figure appears on Exhibit 7 -- an exhibit which Mr. Goodsell compiled -- next to the heading: "Cumulative Monies Diverted from Creditors." Exhibit 7 specifically contains the following information regarding what Mr. Goodsell contends should have been

[18] There was a negative balance of $48,433.90 because Debtor paid CGS $49,000. Thus, in this quarter it would seem that Debtor paid CGS more than 80% of the balance sheet cash balance.

[19] There was a negative balance of $113,852.82 because SVTIX paid CGS $170,000.

[20] There was a negative balance of $46,324.24 after SVTIX paid CGS.

**EXHIBIT C**

allocated to creditors and to the reserve fund, and what amounts
were actually paid:[21]

| Time Period | Net Income | 80% for Creditors/ (Amount Actually Paid) | 20% Reserve |
|---|---|---|---|
| Jan-Dec 07[22] | $113,992.45 | $91,193.96/(NA) | $22,798.49 |
| Jan-Dec 08 | $612,495.23 | $489,996.18/($306,268.00) | $122,499.05 |
| Jan-Dec 09 | $1,031,853.27 | $825,482.62/($267,660.06) | $206,370.65 |
| Jan-Jun 10 | $295,524.94 | $236,419.95/($158,916.67) | $59,104.99 |
| Totals | $2,053,865.89 | $1,643,092.71/($732,844.73)[23] | $410,773.18 |

The figures reached by Mr. Goodsell in Exhibit 7 are somewhat
inflated and are premised upon suspect data;[24] therefore, the Court
gives Exhibit 7 little weight.  In compiling Exhibit 7, Mr.
Goodsell attempted to "back out" or "add back" what he deemed were
improper purchases.  For instance, Mr. Goodsell included in "net
income" any funds which Mr. Goodsell believed Debtor was not
authorized to spend prior to the 80/20 split -- including funds

[21] The actual payout numbers are not correct.  See Tr. 493:12-
25 and 494:1-10.

[22] The data for Jan-Dec 07 are inaccurate and do not reflect
the confirmation of the Plan, which occurred in August 2007.  The
80/20 split did not go into effect until after confirmation.

[23] The $819,054.02 figure appears to be premised upon the
following mathematical calculation: $1,643,092.71 (the 80% for
creditors) minus $732,844.73 (the amount actually paid to
creditors) minus $91,193.96 (the amount allocable to calendar year
2007).

[24] Mr. Goodsell compiled Exhibit 7 using information from
Exhibit 5.  However, Exhibit 5 was not admitted into evidence nor
authenticated.  When questioned about Exhibit 5, Ms. Rubio did not
know who prepared it.  Tr. 604:2-5; Tr. 649:17-19.

EXHIBIT C

1  actually spent on the UPS systems, approximately $105,000.00 spent

2  on consulting, and approximately $230,000.00 spent on contractors[25]

3  -- which Mr. Goodsell believed should have been purchased with the

4  20% reserve funds. Tr. 452:7-10; Tr. 453:18-25; Tr. 454:13-18 and

5  23-24; Tr. 458:1-5; Tr. 459:2-5; Tr. 474:13-20; Tr. 475:21-23; Tr.

6  476:19-25. However, Mr. Goodsell acknowledged that it was possible

7  that some of the Debtor's expenditures, such as UPS Charlie, may

8  have led to additional income, and that Mr. Goodsell included such

9  income in the net figures. Tr. 453:18-25; Tr. 457:5-6. Mr.

10 Goodsell also testified that any add-back likely would have been

11 reduced or offset by any of Debtor's expenses which were reimbursed

12 by customers. Tr. 461:6-23; Tr. 464:2-7.

13     Mr. Rubio testified that in determining how much money would

14 be paid to CGS or to creditors under the 80/20 split provided for

15 in the Plan, Mr. Rubio deducted amounts that were paid to

16 contractors[26] before determining the percentages. Tr. 75:1-4. Mr.

17 Rubio also stated that no distribution was made in January 2008

18 because there was a dispute as to CGS's fee application, and

19 because Mr. Rubio needed to determine what amounts were needed to

20 pay for taxes and insurance. Tr. 81:10-22; Tr. 91:5-12. Mr. Rubio

21 stated that the funds were available to pay CGS, but Mr. Rubio did

22 not place the funds in escrow. Tr. 92:5-7; Tr. 94:2-3 and 9-10;

23 Tr. 96:13-16. Mr. Rubio acknowledged that the funds were used to

24
_____

25     [25] Mr. Goodsell explained that the add-back for consulting and
   contractors included amounts paid for improvements, equipment, and
26 repairs, but not amounts paid for ordinary expenses. Tr. 464:11-
   24; Tr. 475:21-23; Tr. 476:19-22.

27     [26] According to Mr. Rubio's testimony, at least some of the
   amounts paid to contractors included maintenance, in addition to
28 repairs and installations. Tr. 66:9-15; Tr. 68:16-22.

Case: 01-55137   Doc# 1159-1   Filed: 03/04/13   Entered: 03/04/13 16:07:47   Page 3
                                                of 14   22
Case: 14-52449   Doc# 18-1   Filed: 07/08/14   Entered: 07/08/14 13:27:16   Page 27
                                of 38
Case: 14-52449   Doc# 97   Filed: 01/20/15   Entered: 01/20/15 10:52:41   Page 62 of
                                73

EXHIBIT C

1  pay for "some unexpected expenses." Tr. 96:25 to 97:2. According

2  to Mr. Rubio, when Debtor paid CGS at the end of 2008, Debtor's

3  accounts were emptied. Tr. 95:17-18.

4      According to Mr. Goodsell, between May 2010 and November 2011,

5  Debtor paid CGS approximately $15,000.00 to $20,000.00 in

6  attorney's fees. Tr. 256:4-11. Mr. Goodsell projected that if

7  Debtor's payments to CGS proceeded at the same pace, Debtor's debt

8  to CGS would not be paid in full by the termination of the master

9  lease. Tr. 255:10-13.

10     The Addendum to the Disclosure Statement projected that all

11 unsecured creditors would be paid in full within three years or

12 less of confirmation. Addendum at p. 6, lines 6-10. However, in

13 the more than five years since confirmation of the Plan, Debtor has

14 paid nothing to the unsecured creditors from Debtor's business

15 income. Tr. 134:9-17; Tr. 135:12-18; Tr. 142:18-21. Rather,

16 Debtor has disbursed payments to the unsecured creditors of all

17 funds Debtor received from Enron. Tr. 607:6-16; Tr. 630:7-11; Tr.

18 639:2-9. Ms. Rubio believed that apart from the Enron money, no

19 other money was to be distributed to creditors, regardless of how

20 profitable Debtor's business was. Tr. 617:21-25. The total amount

21 of the Enron distributions was not offered into evidence.

22

23     **D. The Motion to Compel**

24     On October 21, 2009, CGS filed a motion seeking to compel

25 Debtor to make payments under the Plan, or seeking an order to

26 appoint a trustee or receiver. See Tr. 144:4-10. According to the

27 motion, Debtor failed to distribute funds in the manner required by

28 the Plan. The motion was joined by creditor David Tilem, who

   represented creditor CBI, and also joined by creditor Randall Lamb

**EXHIBIT C**

1    Associates, one of four assignees of CBI's claim.[27]  On November 9,

2    2009, Debtor filed a brief opposing the motion.

3         In May 2010, the parties agreed upon a methodology for

4    calculating the payments due under the Plan.  This agreement was

5    later incorporated into the July 23, 2010 Order.  The parties'

6    agreement -- and the July 23, 2010 Order -- require Debtor to

7    prepare quarterly balance sheets with three separate cash line item

8    accounts: (1) a tenant prepaid rents liability account ("the Rents

9    Account"); (2) a 20% reserve account ("the Reserve Account"); and

10   (3) a general cash account ("the General Account").

11        The Rents Account was to reflect rents or license fees

12   received by Debtor 30 or more days before the month for which the

13   rent or fee was being paid.  Such rents and fees would then be

14   moved into the General Account.  The Reserve Account was to reflect

15   the cumulative unspent balance of the Reserve Account from the

16   current and previous quarters, as well as customer and tenant

17   reimbursements for expenses paid out of the Reserve Account.

18        Funds in the Reserve Account could be used for repairs or

19   improvements to the Debtor's property located at 250 Stockton Ave.,

20   San Jose, California, could be transferred to the General Account

21   to cover normal operations, or could be distributed to creditors.

22   From the General Account, all ordinary expenses could be paid, as

23   well as any individual repair costing $1,000.00 or less.  Repairs

24   costing more than $1,000.00 and any building improvements were to

25   be paid from the Reserve Account.

26   ───────────────

27        [27] Randall Lamb Associates filed a joinder in CGS's motion on
     November 2, 2009, and filed another document reaffirming such

28   joinder on April 27, 2011.  However, Randall Lamb Associates did
     not participate in the hearing on the motion and has not submitted
     any argument papers of its own.

**EXHIBIT C**

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1     However, if there were insufficient funds in the Reserve

2  Account to pay for a required repair, then funds from the General

3  Account could be used, with immediate notification to be given to

4  Scott Goodsell and Marcia Gerston.[28]  If there were insufficient

5  funds for a required building improvement, Debtor could request, in

6  writing, the use of General Funds.  Such building improvement would

7  require advance approval of Scott Goodsell or Marcia Gerston.

8  However, use of the General Account funds for a non-repair expense

9  would otherwise be a breach of the Plan.  Under the parties'

10  stipulation, approval by Mr. Goodsell or Ms. Gerston "shall not be

11  unreasonably withheld."  See Joint Status Statement, p. 3.

12     The parties' agreement, and the July 23, 2010 Order, clarify

13  that the quarterly distribution to the general unsecured creditors

14  is to consist of 80% of the of the total in the General Account at

15  the end of the quarter.  In addition, Debtor is required to provide

16  copies of quarterly profit and loss reports, quarterly balance

17  sheets, check registers, and a report listing tenants and the

18  amounts of prepaid rents by tenant in the Rents Account.  The July

19  23, 2010 Order specifies that Debtor must provide such documents

20  and reports to any creditor who has made a written request.  Debtor

21  is also required to maintain separate bank accounts for the Reserve

22  Account and the Rents Account.

23     On July 15, 2010, CGS filed a status conference statement.

24  According to CGS, Debtor's July 2010 payment to CGS in the amount

25

26     [28] Mr. Goodsell testified that Debtor could not make a major
repair if there were insufficient funds in the 20% reserve account.

27  Tr. 464:19-25; Tr. 465:1-25; Tr. 466:1.  In so testifying, Mr.
Goodsell made no mention of the possibility that Debtor could

28  obtain approval to use non-reserve funds for a major repair.
Perhaps Mr. Goodsell anticipated that any request for approval
would be denied, but it is not clear from Mr. Goodsell's testimony.

EXHIBIT C

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1   of $13,274.05 failed to comply with the parties' agreement.  Based

2   thereon, the Court set an evidentiary hearing to determine Debtor's

3   compliance with the Plan.

4        Mr. Goodsell considered what it would cost to hire the

5   equivalent of a trustee to manage the property each year and

6   concluded that it would cost approximately $2,500 per month, or

7   $30,000 per year.  Tr. 256:22-25; Tr. 257:1-17.  However, no

8   specific evidence was offered on the actual cost of appointing any

9   particular receiver or other person.

10       There is _no_ evidence that Debtor failed to comply with the

11  parties' agreement, or the July 23, 2010 Order, after July 2010.

12

13  **II. Conclusions of Law**

14       There can be no serious dispute that, prior to the parties'

15  stipulation as to the calculation of "net proceeds" under the Plan,

16  Debtor did not make the required distributions to the general

17  unsecured creditors.  Whether Debtor is correct in its assertion

18  that the calculation of net proceeds should have been on a "balance

19  sheet cash balance" basis, or whether CGS and Tilem are correct in

20  their assertion that the calculation should have excluded

21  unpresented checks, is not an issue the Court needs to decide,

22  partly because of the stipulation and the July 23, 2010 Order, but

23  also for several additional reasons.

24       Even if Debtor were correct about how the calculation was to

25  be made, Debtor failed to allocate 80% of the net proceeds under a

26  "balance sheet cash balance" analysis to the general unsecured

27  creditors.  Using the parties' stipulated figures, Debtor's

28  payments to CGS between December 2007 and June 2010 were short by

    more than $200,000.00.

Case: 01-55137   Doc# 1159-1   Filed: 03/04/13   Entered: 03/04/13 16:07:47   Page 7
of 14   26

Case: 14-52449   Doc# 18-1   Filed: 07/08/14   Entered: 07/08/14 13:27:16   Page 31
of 38

Case: 14-52449   Doc# 97   Filed: 01/20/15   Entered: 01/20/15 10:52:41   Page 66 of

**EXHIBIT C**

73

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1    Debtor's decision to use proceeds allocable to general

2  unsecured creditors in order to purchase UPS Charlie and UPS David

3  violated the Plan.  These sizable purchases were made to expand

4  Debtor's business to bring in new customers.  Admittedly, UPS

5  Charlie was profitable and paid for itself.  UPS David might well

6  have done the same, but Debtor did not complete construction on UPS

7  David after being told by CGS to cease further construction.

8  Profitability of a plan violation, however, is not the test.

9    Debtor's violation of the Plan was flagrant.  The evidence

10  unequivocally shows that Debtor completely disregarded its

11  obligations under the Plan.  After the Plan was confirmed, Debtor

12  assigned all financial tasks to Ms. Rubio, who never read the Plan

13  fully and simply glanced at it.  Debtor also never shared a copy of

14  the Plan with Debtor's accountants.  In short, Debtor failed to

15  take Debtor's Plan obligations seriously.

16    CGS and Tilem's closing briefs state that neither seeks a

17  monetary award.  CGS and Tilem ask this Court to appoint a receiver

18  to manage Debtor's business operations going forward, or

19  alternatively, to convert the bankruptcy case to Chapter 7.  Tilem

20  specifically requests appointment of Randy Sugarman to serve as

21  receiver.  Although CGS previously sought appointment of a trustee,

22  CGS now acknowledges that it is no longer possible to appoint a

23  trustee under Chapter 11, but asserts that the Court has authority

24  under California law to appoint a trustee because the Plan can be

25  treated as a final judgment under Fed. R. Civ. P. 69(a).

26    Debtor contends that neither remedy is appropriate within the

27  context of this case.  Debtor asserts that the remedies available

28  to CGS and Tilem include suing Debtor for breach of contract,

bringing an adversary proceeding to compel compliance with the

Case: 01-55137   Doc# 1159-1   Filed: 03/04/13   Entered: 03/04/13 16:07:47   Page 8
of 14   27

Case: 14-52449   Doc# 18-1   Filed: 07/08/14   Entered: 07/08/14 13:27:16   Page 32
of 38

Case: 14-52449   Doc# 97   Filed: 01/20/15   Entered: 01/20/15 10:52:41   Page 67 of

EXHIBIT C

73

1  Plan, or seeking conversion or dismissal of the bankruptcy case.

2  Debtor argues that the Plan cannot be treated as a final judgment,

3  that appointment of a receiver is not appropriate, and that neither

4  CGS nor Tilem has presented a carefully drafted proposal for

5  appointment of a receiver.  Debtor also opposes conversion.

6      The parties are in agreement that conversion to Chapter 7 is

7  an available remedy expressly contemplated in the Plan and under 11

8  U.S.C. § 1112(b).  However, none of the parties prefers this

9  remedy.  At the hearing, the Court remarked to the parties that

10 this case did not appear to be a Chapter 7 case.  Debtor's tax

11 returns through 2009 indicate that Debtor is profitable; the only

12 issue seemed to be whether Debtor has been making the required

13 distributions.

14     The question, then, is what other remedies exist.  In <u>Murdock</u>

15 <u>v. Holquin</u>, 323 B.R. 275, 282-83 (N.D. Cal. 2005) (Judge Ware), the

16 district court stated that when a reorganized debtor defaults under

17 the terms of a confirmed Chapter 11 plan, the creditors entitled to

18 payment under the plan may assert an action for breach of contract

19 in an appropriate court, or may request conversion of the case to

20 Chapter 7 if there has been a "material default."  The district

21 court did not offer any alternative choices, but also did not

22 purport to offer a conclusive list of options.

23     That confirmed Chapter 11 plans are viewed through a

24 contractual lens was also the import of <u>Miller v. United States</u>,

25 363 F.3d 999 (9th Cir. 2004).  In considering whether a tax debt

26 was discharged under the plan, the appellate court observed that

27 "[a] Chapter 11 bankruptcy plan is essentially a contract between

28 the debtor and his creditors, and must be interpreted according to

   the rules governing the interpretation of contracts."  <u>Id.</u> at 1004.

Case: 01-55137   Doc# 1159-1   Filed: 03/04/13   Entered: 03/04/13 16:07:47   Page 9
of 14   28

Case: 14-52449   Doc# 18-1   Filed: 07/08/14   Entered: 07/08/14 13:27:16   Page 33
of 38

Case: 14-52449   Doc# 97   Filed: 01/20/15   Entered: 01/20/15 10:52:41   Page 68 of

73

EXHIBIT C

1   Interestingly, because the contract was ambiguous, the appellate

2   court construed the ambiguous terms against the drafter -- the

3   debtor -- "based on the interpretive principle that ambiguous

4   contractual provisions are to be construed against their drafter."

5   Id. at 1005-06.  This is interesting because the drafter in the

6   case at bar was not Debtor, but instead was Debtor's counsel.  The

7   argument could therefore be made that any ambiguity in the term

8   "net proceeds" should be construed against CGS, the drafter of this

9   disputed term.

10      However, it is not necessary for the Court to address the

11  propriety of the remaining remedies sought by CGS and Tilem.  Under

12  the Plan, this Court has retained the authority to enforce and

13  implement the Plan, and to enter orders "in aid of consummation" of

14  the Plan.  Under the unique circumstances of this case, the Court

15  concludes that certain safeguards need to be put in place in order

16  to ensure that Debtor complies with Debtor's obligations under the

17  Plan.

18      Under 11 U.S.C. § 1107(a), a debtor-in-possession has certain

19  rights and responsibilities.  After confirmation of a plan, a

20  debtor-in-possession shall "file such reports as are necessary or

21  as the court orders[.]"  11 U.S.C. § 1106(a)(7).  Here, because of

22  the ambiguity in the Plan as to how payments should be calculated,

23  Debtor has agreed to make payments in accordance with a stipulated

24  methodology.  The July 23, 2010 Order binds the parties to this

25  methodology and already imposes a reporting requirement on Debtor.

26  As stated earlier, the July 23, 2010 Order requires Debtor to

27  prepare quarterly balance sheets which distinguish between prepaid

28  rents, the 20% placed into reserve, and the 80% allocated to the

    creditors.  Debtor also must provide quarterly profit and loss

EXHIBIT C

1 reports, quarterly balance sheets, and check registers, as well as
2 a list of tenants and prepaid rents.  All of these reports are
3 necessary to allow creditors to verify that Debtor is complying
4 with the Plan, as clarified by the July 23, 2010 Order.

5       It is apparent that CGS and Tilem do not trust Debtor to apply
6 the stipulated methodology correctly, and with good reason.
7 Debtor's repeated violations of the Plan prior to entry of the
8 stipulation, Ms. Rubio's lack of accounting expertise, Ms. Rubio's
9 failure to understand the requirements of the Plan, and Debtor's
10 failure to inform Debtor's accountants about the Plan's
11 requirements undoubtedly led to this loss of confidence.  In
12 addition, CGS has offered evidence that Debtor paid CGS no more
13 than $20,000.00 between May 2010 and November 2011 -- an undeniably
14 small sum compared with Debtor's prior payments.  The diminished
15 payments to CGS could be explained by the loss of Verio and NTTA as
16 tenants in May 2010.  Importantly, the record is devoid of evidence
17 showing that Debtor has incorrectly applied the stipulated
18 methodology after July 2010.

19       Nevertheless, in light of Debtor's past Plan violations,
20 caused largely by Mr. Rubio's lack of diligence in complying with
21 the Plan and Ms. Rubio's lack of accounting sophistication and
22 failure to understand the Plan's requirements, a prospective order
23 compelling Debtor to make Plan payments is appropriate.  From the
24 date of this Order onward, Debtor shall make all payments required
25 by the Plan in the manner clarified by the July 23, 2010 Order.

26       To aid consummation of the Plan, the Court orders that Debtor

27

28

Case: 01-55137   Doc# 1159-1   Filed: 03/04/13   Entered: 03/04/13 16:07:47   Page 11
of 14   30

Case: 14-52449   Doc# 18-1   Filed: 07/08/14   Entered: 07/08/14 13:27:16   Page 35
of 38

Case: 14-52449   Doc# 97   Filed: 01/20/15   Entered: 01/20/15 10:52:41   Page 70 of
73

EXHIBIT C

1  shall employ, at Debtor's expense, a certified public accountant[29]

2  to ensure that Debtor's business operations and expenditures comply

3  with the Plan and with the July 23, 2010 Order.  Such accountant

4  shall prepare and certify all of the quarterly reports required by

5  the July 23, 2010 Order, as being in compliance with the Plan and

6  such Order, and shall make and certify the required disclosures

7  which Debtor stipulated to make.  The accountant shall also audit

8  Debtor's balance sheet and the accounting tasks performed by Ms.

9  Rubio or anyone else on behalf of Debtor, and shall certify that

10  accounting and distributions are, in the accountant's professional

11  opinion, in compliance with the Plan and the July 23, 2010 Order.

12  If, in the accountant's judgment, the accounting and other

13  financial work performed by Debtor (either through Ms. Rubio or

14  anyone else) is unreliable, the accountant shall prepare a written

15  explanation as to what is unreliable and why it is unreliable,

16  shall provide the written explanation to Debtor and any creditors

17  who requested written reports under the terms of the July 23, 2010

18  Order, and shall do the calculations him or herself.  Debtor shall

19

20  [29] Debtor may employ any qualified, certified public accountant
    to perform these duties, including the accountants whom Debtor has
21  employed to prepare tax returns.

22

23

24

25

26

27

28

EXHIBIT C

1   cooperate fully and at all times with the accountant(s).[30]

2   **IT IS SO ORDERED.**

3 Dated:

4           March 4, 2013

5                              ARTHUR S. WEISSBRODT
                             UNITED STATES BANKRUPTCY JUDGE

---

[30] The Court has not ruled out the possibility that a receiver or trustee may be appointed. See Silverman v. Tracar, S.A. (In re American Preferred Prescription, Inc.), 255 F.3d 87 (2d Cir. 2001) (the bankruptcy court appointed a Chapter 11 trustee post-confirmation; the district court found this was improper because the plan did not allow such appointment, but the appeals court reversed the district court's decision on other grounds). The Court also has not ruled out the possibility of converting this case to Chapter 7 if Debtor should fail to comply with this Order or with the July 23, 2010 Order, or if Debtor should fail to make any required Plan payments in the future.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

**EXHIBIT C**

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1      Court Service List

2

3    Silicon Valley Telecom Exchange
     250 Stockton Ave.
4    San Jose, CA 95126

5

6    Marc L. Pinckney
     4660 La Jolla Village Dr.
     Fifth Floor, PMB 50077
7    San Diego, CA 92122

8

9    Gregory J. Charles
     Law Offices of Gregory Charles
     2131 The Alameda #C2
10   San Jose, CA 95126

11

12   Bernard Greenfield &
     Marcia E. Gerston
     Greenfield Sullivan Draa & Harrington LLP
13   55 S. Market St. #1500
     San Jose, CA 95113

14

15   Courtesy Copies to:

16   Scott Goodsell
     William Healy
17   Campeau, Goodsell Smith
     440 N 1st St. #100
18   San Jose, CA 95112

19

20   David Tilem
     206 N Jackson St #201
     Glendale, CA 91206

21

22

23

24

25

26

27

28

Case: 01-55137   Doc# 1159-1   Filed: 03/04/13   Entered: 03/04/13 16:07:47   Page 14
of 14   33

Case: 14-52449   Doc# 18-1   Filed: 07/08/14   Entered: 07/08/14 13:27:16   Page 38
of 38

Case: 14-52449   Doc# 97   Filed: 01/20/15   Entered: 01/20/15 10:52:41   Page 73 of
73

**EXHIBIT C**